1
PAOLA M. ARMENI, ESQ.
Nevada Bar No. 8357
2
WILLIAM D. SCHULLER, ESQ.
Nevada Bar No. 11271
3
**CLARK HILL PLLC**
1700 S. Pavilion Center Drive, Suite 500
4
Las Vegas, Nevada 89135
Telephone:  (702) 862-8300
5
Facsimile:  (702) 778-9709
E-mail:  parmeni@clarkhill.com
6
           wschuller@clarkhill.com

7
Attorneys for Plaintiffs,
Dwayne L. Schomer and Braylen Schomer,
8
"Schomer Family"

9                    **UNITED STATES DISTRICT COURT**

10                         **DISTRICT OF NEVADA**

11                                  * * *

12
DWAYNE L. SCHOMER, as special                 CASE NO.
administrator of THE ESTATE OF KEATON
13
M. SCHOMER and individually; and
BRAYLEN SCHOMER, individually,                **COMPLAINT WITH JURY
14                                            DEMAND**

15                        Plaintiffs,

16            vs.

17
ELKO COUNTY; ELKO COUNTY
SHERIFF'S OFFICE; SHERIFF AITOR
18
NARVAIZA, individually; UNDERSHERIFF
JUSTIN AIMES, individually; SERGEANT
19
MICHAEL SILVA, individually; DEPUTY
TREVOR L. SNEED, individually; DEPUTY
20
DOUGLAS HOLLADAY, individually;
DEPUTY ERIKA GONZALEZ; MEDALLUS
21
& VACHAROTHONE LTD; DR. RACHOT
VACHAROTHONE, individually; BAILEY
22
POWELL, individually; GEOFFREY FISHER,
individually; MERCEDES COCHRELL,
23
individually; LETISCYA CHACON,
individually; DOE SUPERVISORS I-X; DOE
24
DEPUTIES I-X; DOE MEDICAL STAFF I-X;
and ROE ENTITIES I-X,
25

26                        Defendants.

27

28

COMES NOW, Plaintiffs DWAYNE L. SCHOMER, as administrator of THE ESTATE OF KEATON M. SCHOMER and individually, and BRAYLEN SCHOMER, individually, by and through their undersigned attorneys at Clark Hill, PLLC, and hereby complains and alleges against Defendants for damages resulting from the wrongful death of Keaton M. Schomer, as a result of the conduct of Defendants and their officers, employees, and/or agents.

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 as a civil action for the deprivation of Keaton's rights secured by both the Constitution of the United States and the Constitution of the State of Nevada and federal laws.

2.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

4.      The instant Complaint is filed within the applicable statutes of limitations.

5.      On any issue herein triable of right by a jury, Plaintiffs demand a jury pursuant to FRCP 38.

## THE PARTIES

6.      Plaintiff DWAYNE SCHOMER is the special administrator of the Estate of Keaton M. Schomer, deceased pursuant to the Order Approving Appointment of Special Administrator, filed March 25, 2022, *In the Matter of the Estate of: Keaton Michael Schomer*, Elko County District Court Case No. DC-PR-22-46.

7.      Plaintiff DWAYNE SCHOMER, Keaton's natural father, is an individual residing in Elko County, Nevada.

8.      Plaintiff BRAYLEN SCHOMER, Keaton's sister, is an individual residing in Elko County, Nevada.

9.      Defendant ELKO COUNTY is a political subdivision of the State of Nevada.

10.     Defendant ELKO COUNTY SHERIFF'S OFFICE is a political subdivision of the County.

///

11.    Defendant SHERIFF AITOR NARVAIZA is, and at all times relevant hereto was, a resident of Elko County, Nevada and the Sheriff of the County, and is sued in his individual capacity.

12.    Defendant UNDERSHERIFF JUSTIN AIMES was at all times relevant hereto a resident of Elko County, Nevada and the Undersheriff of the County, and is sued in his individual capacity.

13.    Defendant SERGEANT MICHAEL SILVA was at all times relevant hereto a resident of Elko County, Nevada and an employee of the Sheriff's Office, and is sued in his individual capacity.

14.    Defendant DEPUTY TREVOR L. SNEED was at all times relevant hereto a resident of Elko County, Nevada and an employee of the Sheriff's Office, and is sued in his individual capacity.

15.    Defendant DEPUTY DOUGLAS HOLLADAY was at all times relevant hereto a resident of Elko County, Nevada and an employee of the Sheriff's Office, and is sued in his individual capacity.

16.    Defendant DEPUTY ERIKA GONZALEZ was at all times relevant hereto a resident of Elko County, Nevada and an employee of the Sheriff's Office, and is sued in her individual capacity.

17.    Defendant MEDALLUS & VACHAROTHONE LTD ("Medallus Medical") is a domestic limited-liability company.

18.    DR. RACHOT VACHAROTHONE was at all times relevant hereto a principle of Medallus Medical and is sued in his individual capacity.

19.    Defendant BAILEY POWELL was at all times relevant hereto an employee of Medallus Medical and is sued in her individual capacity.

20.    Defendant GEOFFREY FISHER was at all times relevant hereto an employee of Medallus Medical and is sued in his individual capacity.

21.    Defendant MERCEDES COCHRELL was at all times relevant hereto an employee of Medallus Medical and is sued in her individual capacity.

22.     Defendant LETISCYA CHACON was at all times relevant hereto an employee of Medallus Medical and is sued in her individual capacity.

23.     Defendant DOE SUPERVISORS I-X, inclusive, are supervisory and/or policy making officials of the Sheriff's Office who have adopted, implemented, maintained, or tolerated policies which facilitated, permitted, or allowed the violation of Keaton's civil rights and/or the killing of Keaton, or who negligently trained, hired, or supervised officers, agents, or employees of the Sheriff's Office.

24.     Defendant DOE DEPUTIES I-X, inclusive, are the individual members of the Sheriff's Office who assisted, participated in, facilitated, permitted, or allowed the violation of Keaton's civil rights and/or the killing of Keaton.

25.     Defendant DOE MEDICAL STAFF I-X, inclusive, are the individual members of Medallus Medical who assisted, participated in, facilitated, permitted, or allowed the violation of Keaton's civil rights and/or the killing of Keaton.

26.     The true names and capacities, whether individual, corporate, associate, partnership, or otherwise of Defendants herein designated as DOE SUPERVISORS I-X, DOE DEPUTIES I-X, DOE MEDICAL STAFF I-X, and ROE ENTITIES I-X are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.

27.     Plaintiffs will request leave of the Court to insert the true names and capacities of DOE and ROE Defendants when the same have been ascertained and will further request leave to join said Defendants to the instant action.

28.     At all times relevant to this Complaint, all the actions of the County, the Sheriff's Office, Sheriff Narvaiza, Undersheriff Aimes, Sergeant Silva, Deputy Sneed, Deputy Holladay, Deputy Gonzalez, DOE SUPERVISORS I-X, and DOE DEPUTIES I-X (collectively, "Elko Defendants") were performed under color of state law and pursuant to their authority as law enforcement officers.

29.     Medallus Medical, Dr. Vacharothone, Powell, Fisher, Cochrell, and Chacon are collectively referred to as "Medallus Defendants" herein.

///

30.     The Sheriff's Office operates the Elko County Jail (a/k/a Elko County Detention Center), located at 775 West Silver Street, Elko, Nevada 89801.

31.     Upon information and belief, Medallus Medical has a contract with the Sheriff's Office to provide medical care and services to those in custody at the Jail.

**GENERAL ALLEGATIONS**

32.     On August 15, 2021, Keaton was housed at the Jail for a misdemeanor charge.

33.     On August 15, 2021, Keaton made a recorded call from the Jail to his mother, Danielle Donohue, during which he stated that he was sick and that "the food here is poison."

34.     On August 15, 2021, Keaton made a recorded call from the Jail to Schomer during which he stated that he was sick and that he was defecating everywhere.

35.     On August 17, 2021, Keaton made a recorded call from the Jail to Danielle during which he stated that he "was about to die in here," that he could not eat or drink, that he had been poisoned, that he would die if Danielle did not request juice or water for him, and that he was not taking his medication.

36.     On August 23, 2021, Keaton was booked into the Elko County Jail after his arrest for allegedly propelling bodily fluids, domestic battery, assault, and coercion.

37.     The Declaration of Probable Cause for Keaton's arrest on August 23, 2021, states in pertinent part that on August 22, 2021, officers "were told that Keaton was having a schizophrenic episode…  We arrived and spoke with Keaton's mother who said that Keaton was not taking his medication…  At the time it was decided that Keaton needed to be evaluated for his mental health issues and he was not placed into custody at that time as he went to the hospital."

38.     The next day, August 23, 2021, officers with the Sheriff's Office removed Keaton from Northeastern Nevada Regional Hospital ("NNRH"), where he was being treated for his mental health issues, and took Keaton into custody, due in part to his erratic behavior, which included urinating in a garbage can while laughing at NNRH staff.

///

///

///

39.     Beginning on August 23, 2021, Keaton had severely chapped lips, which is often caused by dehydration. Keaton also repeatedly defecated himself and asked for water. However, several of the Jail's cells he was housed in did not have a shower or running water. Defendants, rather than addressing Keaton's medical and mental condition, joked with one another about his condition.

40.     On or about August 23, 2021, bodycam footage from a corrections officer at the Jail shows Keaton kneeling over the toilet in his cell ("Hold A"), informing a Medallus employee that he had vomited blood.  The Medallus employee tells Keaton not to flush the toilet next time he vomits blood so "that way I can come see it and then we can get you the medical help you need."

41.     On or about August 24, 2021, bodycam footage from a corrections officer at the Jail shows officers moving Keaton from "Hold A" to another cell ("2"). Keaton was lying on the floor of "Hold A" and his appearance was disheveled.

42.     On or about August 27, 2021, bodycam footage from a corrections officer at the Jail shows officers opening Keaton's cell 2 to inform him that "Medical wants to see you."  Keaton was lying on the floor of his cell. He was transported to the Jail's medical room.

43.     On or about August 29, 2021, bodycam footage from a corrections officer at the Jail shows Keaton being moved to a different cell.

44.     On or about August 29, 2021, bodycam footage from a corrections officer at the Jail shows Keaton being transported to the Jail's medical room in a wheelchair. He refuses water from a corrections officer and requests he be sent to the hospital. After two unsuccessful attempts, a Medallus employee starts an IV on Keaton, noting that he is dehydrated.

45.     On or about September 1, 2021, bodycam footage from a corrections officer at the Jail shows officers moving Keaton from "Hold E" to "Dressing B" to take a shower. Upon information and belief, Keaton had defecated in his clothes.

///

///

///

46.     On or about September 1, 2021, bodycam footage from a corrections officer at the Jail shows officers entering "Dressing B" with a restraint. Sergeant Silva appears to kick Keaton as he is lying on the ground. Multiple officers restrain Keaton with his stomach on the floor, his legs crossed at the ankles behind his back, with an officer holding Keaton's feet together. Keaton relays to the officers that they are hurting him. The officers handcuff Keaton, tie Keaton's legs together with a strap, and secure his midsection with a harness consisting of three additional straps with buckles. An officer suggests they *drag* Keaton out of his cell. The officers place a final harness with a strap around Keaton's shoulders and attach it to harness on his midsection. The officers proceed to carry Keaton as if he were a piece of luggage the short distance from "Dressing B" to "Hold E."

47.     On or about September 5, 2021, bodycam footage from a corrections officer at the Jail shows officers speaking with a Medallus employee while looking into "Hold E."  However, the audio is muted for the duration of the video.

48.     Due to his mental disorders, Keaton was under the belief that unidentified individuals were poisoning the food and water he was being given at the Jail.

49.     A Medallus Medical "Against Medical Advice (AMA)" form dated September 4, 2021, states that Keaton is declining recommended treatment for a serious medical condition and purports to release Medallus Medical from any legal responsibility for any consequences resulting from his decision. However, this AMA document has a "refused to sign" stamp on it.

50.     Keaton lacked the legal capacity to bind himself to any documents he may have signed given his mental condition at the time.

51.     On the day of Keaton's in-custody death, the Sheriff's Office and Medallus Medical staff finally decided that Keaton's condition had deteriorated to the point that they needed to transfer him to the hospital.

52.     According to internal reports, on September 5, 2021, at approximately 12:12 p.m., Bailey Powell informed Deputy Sneed that Keaton "did not look well."

///

///

53.     However, rather than immediately contacting paramedics to transfer Keaton, staff attended to other matters before an ambulance was called.  For example, Deputy Sneed prioritized booking another inmate into the Jail over tending to Keaton's critical condition. Powell also left Keaton to attend to other unknown tasks.

54.     At approximately 1:00 p.m., Powell attempted to record Keaton's vitals and subsequently advised Sneed that Keaton "needed to bet taken to the hospital per Dr. Rachot."

55.     At approximately 1:38 p.m., Sneed called Elko Central Dispatch to request an ambulance for Keaton.

56.     At approximately 1:43 p.m., Elko City Fire Department arrived at the Jail.

57.     At approximately 1:46 p.m., the Fire Department started CPR and lifesaving measures on Keaton, which continued until approximately 2:09 p.m.

58.     Upon information and belief, individual Defendants, including DOE DEPUTIES I-X and DOE MEDICAL STAFF I-X, did not attempt to perform CPR or any other lifesaving measures on Keaton prior to the Elko City Fire Department arriving.

59.     At approximately 2:17 p.m., Sheriff Narvaiza, Sergeant Czegledi, and Deputy Shoaf arrived at the Jail.

60.     The total disregard and lack of compassion for Keaton continued when paramedics arrived at the Jail.

61.     The BWC of Deputy Sneed paints a disturbing picture of Sheriff's Office deputies and Medallus Medical staff laughing and joking while Keaton lay dying on the cold concrete floor in the Jail. Additionally, Deputy Sneed could not reach his supervisors to report the grave situation.

62.     On August 30, 2022, six days prior to Keaton's death, Deputy Douglas Holladay sent an email to Sergeant Silva, attaching an incident report which documents Keaton's refusal to eat or drink, his refusal of medical attention, and his pleas for help to deputies, including "he is going to die" and "he needs to go to the hospital."

63.     In that same August 30 email, Deputy Holladay states that "I am only sending this to you because I feel like the issue is going to get worse."

///

64. On September 5, 2021, Keaton passed away, having spent the last 13 days of his life, including his 26th birthday, in the Jail.

65. During his 13 days in the Jail, Keaton lost approximately 60 pounds.

66. The Washoe County Regional Medical Examiner's Office determined Keaton's cause of death was complications of dehydration.

67. In his internal report related to Keaton's death, Detective Corporal Marty Hankel notes that he observed a "suicide blanket" in Keaton's cell after his death. Detective Hankel's narrative also states: "Deputy Sneed continued to monitor Schomer and observed him to be lethargic. A Medallus Medical staff member, identified as Bailey Powell, was working and checked Schomer's vitals at approximately 1300 hours. I was told Powell contacted a doctor and was advised to have Schomer taken to the hospital for medical attention. The Elko City Fire Department responded to the jail, and upon entry to the cell, found Schomer to be unresponsive. Schomer was moved out of the holding cell and the Fire Department began administering CPR. Deputy Shoaf advised he arrived on scene and called the time of death 1425 hours.

68. The Elko Fire Department incident report notes that Keaton "reportedly had refused to eat or drink anything since 08/23/2021" and that responding Engine 1 found Keaton "slumped against a bench…unconscious, unresponsive, pulseless and apneic." Medallus reported to Elko Fire Keaton's history of schizophrenia and noncompliance with medications.

69. On September 6, 2021, upon being informed by deputies that Keaton had passed away Schomer immediately expressed his intent to bring a lawsuit against the Sheriff's Office.

70. Schomer's intent is recorded on body cam footage of one of the Sheriff's Office Deputies dispatched to report that Keaton had died at the Jail.

71. On September 9, 2021, Deputy Holladay sent a memo to Undersheriff Ames regarding Keaton's in-custody death, which states in part: "It is my belief that due to a lack of [training], a lack of [experience] with dealing with the mentally ill, and a lack of guidance from our Leader in the Detention Facility, we all failed to perform one of our most important tasks, that is the Health and Safety of all Inmates."

///

72.     Upon information and belief, one of Deputy Holladay's supervisors asked him to delete this sentence from his memo.

73.     Schomer sent a litigation and preservation hold letter to the Jail on or around October 1, 2021.

74.     In a local radio interview held on or about March 16, 2022, Sheriff Narvaiza refers to Keaton's death as a "medical condition" and states that the Jail has had a "tough" time handling inmates with mental health issues at the Jail.

75.     Sheriff Narvaiza noted that he had recently attended a helpful mental health conference sponsored by MedX AirOne.

76.     Upon information and belief, the Sheriff's Office deliberately destroyed crucial evidence in this matter.

77.     On April 21, 2022, Detective Marty Hankel emailed Lieutenant Adrienne Parry, requested any video footage available from July 30, 2021, through September 5, 2021. "There was an extensive amount of video according to Silva and he was starting to download it for me on an external hard drive but had an issue and started to download over again."

78.     On April 24, 2022, Sergeant Silva emailed Detective Hankel regarding video footage at the Jail and stated that he could not download the footage because it was too extensive.

79.     On June 24, 2022, Theresa Pacini, Support Services Manager at the Sheriff's Office, sent a letter to Plaintiffs' counsel which states in pertinent part: "Please be advised only a portion of the video recordings of jail surveillance are able to be provided in regard to your records request as some were not maintained in the jail video system."

80.     The missing video recordings were lost or destroyed while in the possession of the Sheriff's Office.

81.     Upon information and belief, in the four years preceding Keaton's in-custody death, seven inmates have died while incarcerated at the Jail.

82.     Sheriff Narvaiza met with Elko County Commissioners on September 21, 2022, to discuss the worsening frequency and severity of mental health issues in the Jail.

///

# FIRST CAUSE OF ACTION

### Deliberate Indifference to Serious Medical Need

### 42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process)

### Estate Against All Defendants

83.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

84.    As a custom and policy, Defendants failed to provide adequate psychiatric and medical care to detainees, especially those with acknowledged risk of health and/or psychiatric issues and in the instant matter, failed and refused to provide necessary medical care to Keaton, which constituted deliberate indifference.

85.    As a direct and proximate result of Defendants' deliberate indifference in failing to provide necessary psychiatric and medical care for Keaton and in their previous actions related to similar detainees, Elko Defendants' have established a custom and policy for the Sheriff's Office's deputies and employees.

86.    The actions of the Defendants described herein violate clearly established and well-settled federal constitutional rights mandating that Keaton be afforded appropriate medical care while detained at the Jail.

87.    Defendants had access to Keaton's medical records from NNRH documenting that his medical history included bipolar 1 with schizoaffective disorder, bipolar disorder, schizoaffective disorder, and schizophrenia.

88.    Keaton's medical records noted his medications for these mental illnesses, including Depakote (125 mg) and risperidone (1 mg).

89.    Pursuant to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), issued by the American Psychiatric Association, the mental disorders Keaton suffered from can cause an individual to reject basic life essentials such as food and water.

90.    Prior to his incarceration at the Jail in August 2021, the Sheriff's Office was intimately familiar with Keaton's mental health history.

///

91.    For example, the Sheriff's Office screening documents for risk assessment for Keaton's bookings on June 20, 2018; August 5, 2018; July 31, 2021; and August 23, 2021, note that Keaton is bipolar.

92.    Both Schomer and Donohue had informed deputies with the Sheriff's Office on multiple occasions that Keaton needed assistance in obtaining medical treatment related to his mental disorders.

93.    However, Keaton was confined at the Jail with no access to mental health assistance.

94.    Defendants' deprivation of medical care was sufficiently serious to constitute a deprivation of constitutional dimension.

95.    Defendants made intentional decisions to deny Keaton of needed medical care.

96.    Keaton's medical need was objectively serious as it was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

97.    Defendants knew of and disregarded an excessive risk to Keaton's health or safety.

98.    Defendants were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and drew the inference.

99.    The denial of medical care put Keaton at substantial risk of suffering serious harm and in fact, Keaton suffered the most serious harm, unnecessary and wanton infliction of pain and ultimately death.

100.    On Tuesday, August 31, 2021, Sergeant Silva, and Deputy Gonzalez noted that Keaton refused to eat, drink, or take any medications. At one point he was restrained in a "wrap" for kicking and refusing to go back to his cell. No provider was called.

101.    On Wednesday, September 1, 2021, several Deputies noted that Keaton refused to eat, drink, or take any medications. He spent most of the day naked and lying down. He yelled at the deputies several times to take him to the emergency room. No provider was called.

102.    On September 5, 2021, while Keaton was suffering an acute medical condition, Defendants, including Deputy Sneed, and Powell, stood by idly rather than responding with reasonable diligence to treat Keaton prior to the ambulance arriving.

103.     Upon information and belief, individual Defendants, including DOE DEPUTIES I-X and DOE MEDICAL STAFF I-X, did not attempt to perform CPR or any other lifesaving measures on Keaton prior to the Elko City Fire Department arriving.

104.     Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable person under the circumstances would have understood the high degree of risk involved, making the consequence of the defendants' conduct obvious.

105.     As a direct and proximate result of the unlawful conduct of Defendants, Keaton suffered injuries and damages, including death, excruciating pain, and extreme mental and emotional injuries. Further, the Estate suffered damages and is entitled to compensation for loss of enjoyment of life, and mental, physical, and emotional pain and suffering. Thus, the Estate is entitled to compensatory damages against Defendants.

106.     Plaintiffs are entitled damages as to any supervisors with the Sheriff's Office as there was: 1) direct participation in infractions;  2a) directed subordinate in the act or failure to act that deprived Keaton of his constitutional rights; 2b) put in motion a series of acts by the subordinate, or knowingly refused to terminate a series of acts by the subordinate, that the supervisor knew or reasonably should have known would cause the subordinate to deprive Keaton of these rights;  2c)  knowledge that a subordinate was engaging in these acts and knew or reasonably should have known that the subordinate's conduct would deprive Keaton of his rights and failed to act to prevent subordinate from engaging ins such conduct; 2d) disregarded the known or obvious consequence that a particular training deficiency or omission would cause the subordinate to violate Keaton's constitutional rights and that deficiency or omission actually caused the subordinate to deprive Keaton of this constitutional rights; 2e) engaged in conducted that showed a reckless or callous indifference to the deprivation by the subordinate of the rights to others and 3) the supervisor's conduct was so closely related to the deprivation of Keaton's right as to be the moving force that cause the ultimate injury, death.

107.     Plaintiffs are entitled to punitive damages, as Defendants are guilty of oppression, fraud, and/or malice.

108.     Plaintiffs are also entitled to their costs.

109.    Pursuant to 42 U.S.C. § 1988(b), a prevailing civil rights plaintiff may recover reasonable attorney's fees.

## SECOND CAUSE OF ACTION

### Deliberate Indifference to Serious Medical Need

### 42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process) – Monell Liability

### Estate Against County and Medallus Medical

110.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

111.    Upon information and belief, the County and Medallus Medical are or were parties to a contract under which the County remunerates Medallus Medical to provide medical and mental health care services to detainees at the Jail.

112.    The County and Medallus Medical are liable to the Estate pursuant to 42 U.S.C. § 1983 for violating Keaton's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee. These rights are guaranteed under the Fourteenth Amendment to the United States Constitution. A pre-trial detainee is entitled to be protected and not be punished at all, since he has not been convicted of any alleged crime resulting in his incarceration.

113.    The County and Medallus Medical acted or failed to act, through natural persons including individual Defendants, under color of state law at all relevant times. The County's and/or Medallus Medical's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Keaton's suffering, damages, and death, all damages suffered by the Estate.

114.    Plaintiffs need not allege the appropriate chief policymaker(s) as the pleadings stage. Nevertheless, out of an abundance of caution Sheriff Narvaiza was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the Jail's administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners were the relevant chief policymaker.

115.    The County and Medallus Medical were deliberately indifferent regarding policies, practices, and/or customs developed and/or used regarding issues addressed by allegations set forth above. They also acted in an objectively unreasonable manner. The policies, practices, and/or customs referenced herein, as well as the failure to adopt appropriate policies, were moving forces behind and caused violations of Keaton's rights and showed a deliberate indifference to the known or obvious consequences that constitutional violations would occur. The County's and Medallus Medical's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Keaton.

116.    Therefore, the Estate suffered the following damages, for which it seeks recovery, through the administrator, from the County and Medallus Medical:

- Keaton's conscious physical pain, suffering, and mental anguish;
- Keaton's loss of life and/or loss of enjoyment of life;
- Keaton's medical expenses;
- Keaton's funeral expenses; and/or
- Award of exemplary/punitive damages (from Medallus Medical).

117.    Moreover, Plaintiffs seek reasonable and necessary attorney's fees available pursuant to 42 U.S.C. §1988.

**THIRD CAUSE OF ACTION**

**Loss of Familial Association**

**42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process)**

**Schomer Against All Defendants**

118.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

119.    Defendants, acting under color of state law, deprived Plaintiffs of their right to a familial relationship without due process of law by denying Keaton psychiatric and medical treatment, which resulted in Keaton's death, and in violation of his rights, privileges, and immunities secured under federal law.

///

120.    Plaintiffs were deprived of their constitutional right of familial relationship because of Defendants' conduct towards Keaton.

121.    That as a proximate result of the foregoing wrongful acts of Defendants, resulting in Keaton's death, Plaintiffs have been deprived of society, love, comfort, companionship, financial support, emotional support, and support services from Keaton.

122.    The liberty interest in familial companionship encompasses the familial relationship between parents and children, including adult children.

123.    Defendants' conduct shocks the conscience as the circumstances demonstrate that actual deliberation was practical.

124.    In other words, as the circumstances allowed time to make unhurried judgments, Defendants' deliberate indifference shocks the conscience.

125.    Plaintiffs are entitled to compensatory damages against Defendants.

126.    Plaintiffs are entitled damages as to any supervisors with the Sheriff's Office as there was: 1) direct participation in infractions;  2a) directed subordinate in the act or failure to act that deprived Keaton of his constitutional rights; 2b) put in motion a series of acts by the subordinate, or knowingly refused to terminate a series of acts by the subordinate, that the supervisor knew or reasonably should have known would cause the subordinate to deprive Keaton of these rights;  2c)  knowledge that a subordinate was engaging in these acts and knew or reasonably should have known that the subordinate's conduct would deprive Keaton of his rights and failed to act to prevent subordinate from engaging ins such conduct; 2d) disregarded the known or obvious consequence that a particular training deficiency or omission would cause the subordinate to violate Keaton's constitutional rights and that deficiency or omission actually caused the subordinate to deprive Keaton of this constitutional rights; 2e) engaged in conducted that showed a reckless or callous indifference to the deprivation by the subordinate of the rights to others and 3) the supervisor's conduct was so closely related to the deprivation of Keaton's right as to be the moving force that cause the ultimate injury, death.

127.    Plaintiffs are entitled to punitive damages, as Defendants are guilty of oppression, fraud, and/or malice.

1    128.    Plaintiffs are also entitled to their reasonable costs.

2    129.    Pursuant to 42 U.S.C. § 1988(b), a prevailing civil rights plaintiff may recover

3    reasonable attorney's fees.

4    **<u>FOURTH CAUSE OF ACTION</u>**

5    **Negligence**

6    **All Plaintiffs Against Elko Defendants**

7    130.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though

8    set forth fully herein.

9    131.    The County and Sheriff's Office are liable either directly or through respondeat

10    superior.

11    132.    Internal records from the Sheriff's Office document Keaton's refusal to eat and

12    drink and his refusal of medication and medical attention on each day of his incarceration – i.e.,

13    August 23 through September 5.

14    133.    The individual Elko Defendants who caused Keaton's injury and death were under

15    the Sheriff's Office control and their acts or failures to act occurred within the scope of their

16    employment.

17    134.    Elko Defendants owed a duty of care to Keaton to protect him while detained,

18    including ensuring he had adequate access to appropriate medical care.

19    135.    Elko Defendants breached that duty by committing the acts and omissions

20    described herein.

21    136.    The breach was the legal cause of Keaton's injuries.

22    137.    Keaton suffered damages.

23    138.    Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent

24    Nevada law allows.

25    ///

26    ///

27    ///

28

## FIFTH CAUSE OF ACTION

### Gross Negligence

### All Plaintiffs Against Elko Defendants

139.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

140.    Defendants' breach of their duty of care to Keaton constitutes very great negligence, or the absence of slight diligence, or the want of even scant care amounting to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as Keaton was affected.

141.    The individual Elko Defendants who caused Keaton's injury and death were under the Sheriff's Office control and their acts or failures to act occurred within the scope of their employment.

142.    Plaintiffs are entitled to punitive damages, as Elko Defendants are guilty of oppression, fraud, and/or malice.

143.    Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

## SIXTH CAUSE OF ACTION

### Professional Negligence

### All Plaintiffs Against Medallus Medical Defendants

144.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

145.    Medallus Medical is liable either directly or through respondeat superior.

146.    Medallus Medical, Powell, and DOE MEDICAL STAFF I-X had access to Keaton's medical records, including those from NNRH and Golden Health documenting his mental disorders.

147.    Powell and DOE MEDICAL STAFF I-X who caused Keaton's injury and death were under Medallus Medical's control and their acts or failures to act occurred within the scope of their employment.

148.    Internal records from Medallus Medical document Keaton's refusal to eat and drink and his refusal of medication and medical attention on each day of his incarceration – i.e., August 23 through September 5.

149.    On Monday, August 23, 2021, on admission to the Jail, Medical Assistant Bailey Powell triaged Keaton and obtained vital signs that demonstrated an elevated blood pressure and pulse, and his weight was noted as 200 pounds.  No provider was called. The Pre-Booking Triage for Medical/Mental Health notes that Keaton appeared to be hearing voices, seeing things that are not present, and acting overly suspicious or paranoid.

150.    The same day of his arrival at the Jail, Keaton reported to Medical Assistant Mercedes Cochrell that he was throwing up blood. The medical assistant told him to not flush the next time he vomited so that she could see it. He asked to be taken to the hospital. No vital signs were taken, and no provider was called.

151.    On Tuesday, August 24, 2021, Medical Assistant Geoffrey Fisher noted that Keaton refused to take medications and refused his meals. No provider was called.

152.    On Wednesday, August 25, 2021, Fisher noted that Keaton refused take any medications and refused all meals. No provider was called.

153.    On Thursday, August 26, 2021, Cochrell and Fisher noted that Keaton refused to eat, drink, or take any medications. His lips were cracked, and both medical assistants noted that Keaton did not appear to want to survive or thrive.  No provider was called. In his notes for August 26, 2021, Fisher states that "[Keaton] does not appear to have [a] desire to survive."

154.    On Friday, August 27, 2021, Cochrell noted that Keaton refused care and the daily activity log documented that he refused to eat. No provider was called.

155.    On Saturday, August 28, 2021, Keaton refused to eat, drink, or take any medications. Medical Assistant Letiscya Chacon noted that he was dehydrated, and that if he did not start to hydrate or eat, he would start not feeling well. It was noted that a provider was updated on inmate status, but no orders for care were provided.

///

///

156.    On Sunday, August 29, 2021, Keaton demanded water, stating he was going to die. Powell was called in and started an IV which Keaton would not allow her to finish. He asked to go to the hospital. Dr. Vacharothone was notified of the situation, but no orders were given. Later that day, Chacon documented that Keaton would not accept medical care or water and that he had a lack of ambition to nourish himself. No provider was called.

157.    On Monday, August 30, 2021, Chacon noted that Keaton refused to eat, drink, or take any medications. Several deputies documented on a variety of logs that Keaton refused food, water, and meds. No provider was called.

158.    On Thursday, September 2, 2021, Chacon noted that Keaton refused to eat, drink, or take any medications for the entire day. He was taken to court in a wheelchair and laid down on the floor. After court he was taken back to his cell where he continued to refuse to eat, drink, or take any medications. No provider was called.

159.    On Friday, September 3, 2021, Chacon noted that Keaton refused to eat, drink, or take any medications. Chacon also noted that she was called to Keaton's cell because he was not responding to Deputy Lyons. She went to the cell and saw he was mumbling quietly and wanted to be left alone. No vital signs were taken. No provider was called.

160.    On Saturday, September 4, 2021, Deputies noted throughout the day that Keaton refused to eat, drink, or take any medications. Powell attempted to have Keaton sign an AMA (Against Medical Advice) form and noted that he refused. Powell also noted she had to finish her med pass and had other inmates to speak to, so Keaton was left alone in his cell. On video Keaton can be heard calling out for water and stated, "I'm going to die" and he appeared unable to rise from the floor. A cup of water was placed on the floor near his feet, and deputies closed the cell door. No provider was called.

161.    On Sunday, September 5, 2021, it was again documented on the activity log that Keaton refused to eat, drink, or take any medications. Deputy Sneed was notified by Powell at 1212 hours that Keaton did not look well, and his eyes were rolled back in his head. He was noted on video to barely be able to hold up his head up as they poured liquids in his mouth. At 1215 hours Deputy Sneed documented that Keaton appeared "Code 4."

162.   An hour later, at 1317 hours, Powell took Keaton's vital signs and told Deputy Sneed to call an ambulance. Powell then left the cell to attend to other inmates.  Deputy Sneed noted that he had to book another inmate first and did not call for an ambulance until 1338 hours, 21 minutes after being told to call. Deputy Sneed left Keaton alone in his cell until the ambulance arrived.

163.   When the EMS unit arrived at the Jail, they found Keaton still locked in his cell, slumped against the wall, and unresponsive with no pulse or respirations. He was pronounced dead shortly after while still in the Jail.

164.   At Keaton's autopsy, it was noted that he died from complications of dehydration. It was also noted that his weight was 161 pounds, 59 pounds less than when he first arrived at the Jail or 186 pounds, 34 pounds less than when he first arrived at the Jail.

165.   Although it was obvious that Keaton was suffering from a mental illness that had been reported by his family and was notated in Powell's Pre-Booking note when Keaton returned to the jail on Monday, August 23, 2021, no mental health professional was ever consulted to assess his deteriorating condition over the next two-week period.

166.   During this two-week period, Keaton reported seeing colors and hearing people talking, repeatedly refused food or fluids, demonstrated paranoid ideations, and refusing medications. He also demonstrated signs and symptoms of dehydration.

167.   Medallus Medical and Powell had a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise.

168.   Medallus Medical and Powell breached that duty in failing to render Keaton appropriate and proper medical care in the way it responded to Keaton's requests and treatment.

169.   More specifically, Medallus Medical and Powell failed to adhere to appropriate medical practice by failing to prescribe timely and appropriate treatment for Keaton's medical condition and failing to transport Keaton to a hospital and/or a mental health facility.

170.   There is a proximate causal connection between Medallus Medical and Powell's negligent conduct and Keaton's resulting injury.

///

171.     Keaton suffered an actual loss or damage resulting from Medallus Medical and Powell's negligence.

172.     In support of the allegations contained within this Complaint, Plaintiffs attach and incorporate by reference the Declaration of Kathryn J. Wild, RN, MPA, CCHP-RN (**Exhibit 1**).

173.     Plaintiffs are entitled to punitive damages, as Medallus Medical Defendants are guilty of oppression, fraud, and/or malice.

174.     Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Negligent Hiring/Training/Supervision**

**All Plaintiffs Against Sheriff's Office**

175.     Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

176.     Prior to August 2021, the Sheriff's Office had in place and maintained policies or customs exhibiting a deliberate indifference to Keaton's constitutional rights.

177.     The Sheriff's Office owed a duty as an employer to adequately investigate prior to hiring, to properly train, and adequately supervise its employees, servants, ostensible agents, and/or associates in the performance of their job duties and professional responsibility

178.     The Sheriff's Office knew or should have known of the incompetence, ineptitude, and/or dangerous propensities of its employees, servants, ostensible agents, partners, and/or associates.

179.     The Sheriff's Office breached its duty by failing to adequately investigate the backgrounds of, and/or adequately supervise Sheriff's Office employees, servants, ostensible agents, partners, and/or associates.

180.     Specifically, the Sheriff's Office breached its duty by failing to provide prompt and competent access and delivery of medical and mental health attention when detainees such as Keaton were having a mental health crisis requiring prompt and adequate intervention.

///

181.   The Sheriff's Office additionally breached its duty by:

- Failing to provide appropriate and competent staff to safely monitor and observe detainees such as Keaton, who suffered from mental disabilities;

- Failing to implement and/or enforce policies and procedures regarding detainees' refusal to eat and/or drink;

- Failing to provide access and delivery of medical and mental health care and treatment for detainees with known mental disabilities;

- Failing to provide adequate housing and properly classifying detainees to ensure access and delivery of medical and/or mental care;

- Failing to provide adequate and reasonable monitoring and housing for detainees that present a risk of death to prevent mental health disasters such as Keaton's; and

- Failing to supervise its subordinates and/or staff tasked with implementing and complying with policies and procedures to ensure reasonable safety of detainees.

182.   DOE SUPERVISORS I-X breached their duties by failing to read, review, and implement policies requiring detainees to be assessed at intake to determine their medical needs.

183.   The Sheriff's Office failed to exercise reasonable care in hiring deputies and other officers, including one or more of the DOE DEPUTIES and/or DOE SUPERVISORS, thereby failing to adequately prevent constitutional violations on the part of its deputies and other officers.

184.   The Sheriff's Office inadequately trained and supervised its deputies and other officers, including one or more of the DOE DEPUTIES and/or DOE SUPERVISORS, thereby failing to adequately discourage further constitutional violations on the part of its deputies and other officers.

185.   As a direct and proximate result of the above-described policies and customs, deputies and other officers who work in the Jail, including one or more of the DOE DEPUTIES and/or DOE SUPERVISORS, believed their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but rather tolerated and encouraged.

///

186.    The above-described policies and customs demonstrate deliberate indifference on the part of the Sheriff's Office of the constitutional rights of persons detained in the Jail.

187.    Elko Defendants owed a duty of care to Keaton.

188.    Elko Defendants breached that duty by hiring, training, and/or supervising employees even though they knew, or should have known, of employees' dangerous propensities.

189.    The breach was the legal cause of Keaton's injuries.

190.    Keaton suffered damages.

191.    Plaintiffs are entitled to punitive damages, as Elko Defendants are guilty of oppression, fraud, and/or malice.

192.    Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

## EIGHTH CAUSE OF ACTION

### Negligent Hiring/Training/Supervision

### All Plaintiffs Against Medallus Medical

193.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

194.    Medallus Medical owed a duty as an employer to adequately investigate prior to hiring, to properly train, and adequately supervise its employees, servants, ostensible agents, and/or associates in the performance of their job duties and professional responsibility

195.    Medallus Medical knew or should have known of the incompetence, ineptitude, and/or dangerous propensities of its employees, servants, ostensible agents, partners, and/or associates.

196.    Medallus Medical breached its duty by failing to adequately investigate the backgrounds of, and/or adequately supervise Medallus Medical employees, servants, ostensible agents, partners, and/or associates.

197.    Specifically, Medallus Medical breached its duty by failing to provide prompt and competent access and delivery of medical and mental health attention when detainees such as Keaton were having a mental health crisis requiring prompt and adequate intervention.

198.    Medallus Medical additionally breached its duty by:

- Failing to provide appropriate and competent staff to safely monitor and observe detainees such as Keaton, who suffered from mental disabilities;

- Failing to implement and/or enforce policies and procedures regarding detainees' refusal to eat and/or drink;

- Failing to provide access and delivery of medical and mental health care and treatment for detainees with known mental disabilities;

- Failing to provide adequate housing and properly classifying detainees to ensure access and delivery of medical and/or mental care;

- Failing to provide adequate and reasonable monitoring and housing for detainees that present a risk of death to prevent mental health disasters such as Keaton's; and

- Failing to supervise its subordinates and/or staff tasked with implementing and complying with polices and procedures to ensure reasonable safety of detainees.

199.    DOE SUPERVISORS I-X breached their duties by failing to read, review, and implement policies requiring detainees to be assessed at intake to determine their medical needs.

200.    Medallus Medical owed a duty of care to Keaton to treat him while he was in the Jail.

201.    Medallus Medical breached that duty by hiring, training, and/or supervising employees even though they knew, or should have known, of employees' dangerous propensities.

202.    More specifically, Medallus Medical tolerated or fostered the practice of policy of its staff's deliberate indifference regarding providing appropriate medical care, failed to properly screen applicants who applied to work in the Jail; and failed to provide adequate training of staff regarding treating mentally ill patients.

203.    The breach was the legal cause of Keaton's injuries.

204.    Keaton suffered damages.

205.    Plaintiffs are entitled to punitive damages, as Medallus Medical is guilty of oppression, fraud, and/or malice.

///

206.    Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

### NINTH CAUSE OF ACTION

**Negligence Per Se – NRS 41.1395**

**All Plaintiffs Against Elko Defendants**

207.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

208.    Pursuant to NRS 41.1395(1), if a vulnerable person suffers a personal injury or death that is caused by abuse or neglect, the person who caused the injury or death is liable to the vulnerable person for two times the actual damages incurred by the vulnerable person.

209.    Pursuant to NRS 41.1395(4)(a), the definition of *abuse* is willful and unjustified "(1)  Infliction of pain, injury or mental anguish; or (2)  Deprivation of food, shelter, clothing or services which are necessary to maintain the physical or mental health of an older person or a vulnerable person."

210.    Pursuant to NRS 41.1395(4)(c), the definition of *neglect* is "the failure of a person who has assumed legal responsibility or a contractual obligation for caring for an older person or a vulnerable person, or who has voluntarily assumed responsibility for such a person's care, to provide food, shelter, clothing or services within the scope of the person's responsibility or obligation, which are necessary to maintain the physical or mental health of the older person or vulnerable person."

211.    Pursuant to NRS 41.1395(4)(e), the definition of a *vulnerable person* is a person who "(1)  Has a physical or mental impairment that substantially limits one or more of the major life activities of the person; and (2)  Has a medical or psychological record of the impairment or is otherwise regarded as having the impairment."

212.    The individual Elko Defendants who caused Keaton's injury and death were under the Sheriff's Office control and their acts or failures to act occurred within the scope of their employment.

///

213. The individual Medallus Medical Defendants who caused Keaton's injury and death were under Medallus Medical's control and their acts or failures to act occurred within the scope of their employment.

214. Defendants violated NRS 41.1395.

215. The violation was the legal cause of Keaton's injury.

216. Keaton belonged to class of persons that NRS 41.1395 was intended to protect.

217. Keaton's injury was the type against which NRS 41.1395 was intended to protect

218. Keaton suffered damages.

219. Pursuant to NRS 41.1395(2), if it is established by a preponderance of the evidence that a person who is liable for damages pursuant to this section acted with recklessness, oppression, fraud or malice, the court shall order the person to pay the attorney's fees and costs of the person who initiated the lawsuit.

220. Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

## **TENTH CAUSE OF ACTION**

### **Wrongful Death**

### **All Plaintiffs Against Elko Defendants**

221. Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

222. Pursuant to NRS 41.085(2), "[w]hen the death of any person…is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death…[and] [i]f any other person is responsible for the wrongful act or neglect, or if the wrongdoer is employed by another person who is responsible for the wrongdoer's conduct, the action may be maintained against that other person…"

223. Plaintiffs are heirs or personal representatives of Keaton.

224. Defendants caused Keaton's death by wrongful act or neglect.

///

225.    Therefore, under NRS 41.085, Plaintiffs may maintain an action for damages against Defendants.

226.    Plaintiffs are also entitled to their reasonable attorney's fees and costs.

### **ELEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**Schomer and Braylen Schomer Against All Defendants**

227.    Plaintiffs repeat and re-allege the allegations of all preceding paragraphs as though set forth fully herein.

228.    The individual Elko Defendants who caused Keaton's injury and death were under the Sheriff's Office control and their acts or failures to act occurred within the scope of their employment.

229.    The individual Medallus Medical Defendants who caused Keaton's injury and death were under Medallus Medical's control and their acts or failures to act occurred within the scope of their employment.

230.    Defendants' conduct was extreme or outrageous with the reckless disregard for causing emotional distress to Plaintiffs

231.    Plaintiffs suffered severe or extreme emotional distress as the actual or proximate result of Defendants' conduct.

232.    Plaintiffs are also entitled to their reasonable attorney's fees and costs to the extent Nevada law allows.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For compensatory and consequential damages against Defendants;

2.    For exemplary or punitive damages against Defendants in their individual capacities;

///

///

///

1    3.    For an award of reasonable attorney's fees and costs incurred herein;

2    4.    For pre-judgment and post-judgment interest on the foregoing amounts; and

3    5.    For such other and further relief as this Court may deem just and proper.

4    DATED this 1st day of June 2023.

5

6                                        **CLARK HILL, PLLC**

7

8                              By   /s/ Paola M. Armeni
                                  PAOLA M. ARMENI, ESQ.
                                  Nevada Bar No. 8357
9                                 WILLIAM D. SCHULLER, ESQ.
                                  Nevada Bar No. 11271
10                                1700 S. Pavilion Center Drive, Suite 500
                                  Las Vegas, Nevada 89135
11
                                  Attorneys for Plaintiffs,
12                                Dwayne L. Schomer and Braylen Schomer,
                                  "Schomer Family"

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28