# Deposition Transcript

Case Number: 2:23-cv-00390-ART-CSD
Date: March 17, 2025

In the matter of:

# DWAYNE L. SCHOMER, et al v ELKO COUNTY, et al

# Kathryn J. Wild

Reported by:
Michelle A Manni



CERTIFIED COPY

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3                        ---o0o---

 4   DWAYNE L. SCHOMER, as special    )
     administrator of THE ESTATE      )
 5   OF KEATON M. SCHOMER and         )
     individually; and BRAYLEN        )
 6   SCHOMER, individually,           )  Case No.
                                      )  2:23-cv-00390-ART-CSD
 7          Plaintiffs,               )
                                      )
 8   - vs -                           )
                                      )
 9   ELKO COUNTY; ELKO COUNTY         )
     SHERIFF'S OFFICE; SHERIFF        )
10   AITOR NARVAIZA, individually     )
     UNDERSHERIFF JUSTIN AIMES,       )
11   individually; SERGEANT           )
     MICHAEL SILVA, individually;     )
12   DEPUTY TREVOR L. SNEED,          )
     individually; DEPUTY DOUGLAS     )
13   HOLLADAY, individually;          )
     DEPUTY ERIKA GONZALEZ;           )
14   MEDALLUS & VACHAROTOHONE,        )
     LTD; DR. RACHOT VACHAROTOHONE,   )
15   individually; BAILEY POWELL,     )
     individually; GEOFFREY FISHER,   )
16   individually, MERCEDES           )
     COCHRELL, individually;          )
17   LETISCYA CHACON, individually,   )
     DOE SUPERVISORS 1-X; DOE         )
18   DEPUTIES 1-X; DOE MEDICAL        )
     STAFF 1-X; AND ROE ENTITIES      )
19   1-X                              )
                                      )
20          Defendants.               )
                                      )
21   _____)

22

23

24

25
```

Page 2

```
 1         REMOTE DEPOSITION OF KATHRYN J. WILD located at
 2   Mesquite, Nevada, commencing at 11:02 a.m. MDT, on Monday,
 3   March 17, 2025, before Michelle A. Manni, Registered
 4   Professional Reporter and notary public.
 5
 6                       ---oOo---
 7
 8   APPEARANCES VIA STENO CONNECT:
 9    FOR THE PLAINTIFFS:
10          Clark Hill, PLLC
            BY WILLIAM D. SCHULLER, ESQUIRE
11          1700 South Pavilion Center Drive, Suite 500
            Las Vegas, Nevada 89135
12          (702) 862-8300
            wschuller@clarkhill.com
13
14
       FOR THE DEFENDANTS MEDALLUS & VACHAROTOHONE, LTD,
15   DR. RACHOT VACHAROTOHONE, BAILEY POWELL, GEOFFREY
     FISHER, MERCEDES COCHRELL, AND LETISCYA CHACON:
16
            Rencher Anjewierden, LLC
17          BY BENJAMIN K. LUSTY, ESQUIRE
            460 South 400 East
18          Salt Lake City, Utah 84111
            (801) 961-1300
19          ben@lawfirmra.com
20
21    FOR THE DEFENDANT SERGEANT MICHAEL SILVA:
22          Goicoechea, Digrazia, Coyle & Stanton, Ltd.
            BY DAVID M. STANTON, ESQUIRE
23          530 Idaho Street
            Elko, Nevada 89801
24          (775)738-8091
            davidstanton@elkolawyers.com
25
```

Page 3

```
 1   FOR THE DEFENDANTS ELKO COUNTY, SHERIFF AITOR NARVAIZA
     AND UNDERSHERIFF JUSTIN AIMES:
 2
            Marquis Aurbach Chtd.
 3          BY KADEN P. KILLPACK, ESQUIRE
            100001 Park Run Drive
 4          Las Vegas, Nevada 89145
            (702) 382-0711
 5          kkillpack@maclaw.com
 6
 7   FOR THE DEFENDANTS SERGEANT MICHAEL SILVA, DEPUTY TREVOR
     L. SNEED, DEPUTY DOUGLAS HOLLADAY, AND DEPUTY ERIKA
 8   GONZALEZ:
 9          Erickson, Thorpe & Swainston, Ltd.
            BY BRENT RYMAN, ESQUIRE
10          99 West Arroyo Street
            Reno, Nevada 89505
11          (775) 786-3930
            bryman@etsreno.com
12
13
     ALSO PRESENT:
14
            Londyn Simon, Steno tech assistant
15
            Trish Brutka
16
17                       ---oOo---
18
19
20
21
22
23
24
25
```

Page 4

```
 1                       INDEX
 2   EXAMINATION                                         PAGE
 3   OF KATHRYN J. WILD
 4   By Mr. Lusty.........................................6
 5   By Mr. Killpack....................................132
 6   By Mr. Lusty.......................................133
 7
 8                       EXHIBITS
 9   Exhibit 1............................................7
        [Curriculum Vitae]
10
     Exhibit 2...........................................47
11      [Testimony and Deposition History]
     Exhibit 3...........................................49
12      [Initial Report]
13
     Exhibit 4...........................................62
14      [Northeastern Nevada Regional Hospital 17
         Through 35]
15
     Exhibit 5...........................................79
16      [Medallus Medical 1 through 58]
     Exhibit 6..........................................108
17      [Clinic Schedule]
18
     Exhibit 7..........................................125
19      [Rebuttal Report]
     Exhibit 8..........................................133
20      [Mental Health Crisis Packet]
21
22
23
24
25
```

Page 5

```
 1         MONDAY, MARCH 17, 2025, 11:02 A.M. MDT
 2                       ---oOo---
 3         THE COURT REPORTER:  Good morning.  My name is
 4   Michelle Manni with Steno.  Today's date is
 5   March 17, 2025.  The time is approximately 11:02 a.m.
 6   Mountain Daylight Time.  We are here for the remote
 7   deposition of Kathryn Wild taken in the matter of
 8   Dwayne L. Schomer, et al., vs. Elko County, et al.
 9         The attorneys appearing in this deposition
10   acknowledge that I am not physically present in the
11   deposition room, that I will be reporting on this
12   deposition remotely, and that I will administer the
13   oath to the witness remotely.
14         The parties and their counsel further agree that
15   while I am a licensed notary and Registered
16   Professional Reporter, the witness may be in a state
17   where I am not licensed.  The parties stipulate that
18   this deposition may be taken before me.
19         If any party does have an objection to this
20   manner of reporting or anything stated above, please
21   state so now.  Hearing none, we can proceed.
22                       ---oOo---
23                   KATHRYN J. WILD,
24   having been first duly sworn, was examined and testified
25   as follows:
```

Page 14

1  A.  You know, just as -- particularly when I started
2  my career in correctional health care, there were
3  requirements for clinical trainings, obviously, when
4  you -- when you first started a job and annual basis,
5  skills fairs, and those sorts of things.
6      Q.  Did you say "skills" what?
7      A.  Skill fairs.  So typically, in a correctional
8  setting, nurses are required to perform competency testing
9  every year in both San Bernardino and Orange County where
10 I worked.  They called them "skills fairs."  So once a
11 year, you would spend a day, and there would be different
12 clinical areas that you would have to show competency in.
13     Q.  So like start an IV for me, for example?
14     A.  Start an IV, do a mental health assessment,
15 perform CPR appropriately, proper use of nursing
16 protocols, you know, the use of point of care testing
17 equipment like glucometers and INR testing machines, those
18 sorts of things.
19     Q.  All right.  So that to me seems like it's an
20 assessment of skills.  Was there further formal education
21 of skills since 1984?
22     A.  No.  Not in a university level, no.
23     Q.  All right.  Now, if I look at your -- with your
24 training and -- well, with your training, with your
25 education specifically -- and we'll get into your

Page 15

1  credentials in a second, but right now I kind of want to
2  start with your training.  What training have you had
3  specific to mental health care?
4      A.  I attend, on a regular basis, probably every
5  other year -- the Nation Commission on Correctional Health
6  Care has an annual conference on the provision of mental
7  health services in jails and prisons where there is some
8  seminars and -- and trainings on how to assess people for
9  different mental health conditions, treatment modalities,
10 treatment planning.
11     Q.  So seminars through the -- is it NCCHC?  Do I
12 have the acronym right?
13     A.  Correct.  National Commission on Correctional
14 Health Care.
15     Q.  So attending seminars through the NCCHC.  Let me
16 back up.  Let me start over.  My question was specific
17 training on mental health care, and I think the answer you
18 articulated is you've attended seminars through the NCCHC;
19 is that correct?
20     A.  Correct.  You know, then in the course of my
21 work over the years, particularly in San Bernardino, there
22 was training provided regularly by the Department of
23 Behavioral Health on suicide prevention, monitoring
24 patients who were in the mental health isolation or
25 suicide watch, those types of things.  So that training

Page 16

1  was provided by mental health professionals from the
2  county Department of Behavioral Health?
3      Q.  Like as an inservice-type training?
4      A.  Right.  Right.  For the staff working in the
5  jail.  It was provided to nursing professionals, all
6  physician staff, and correctional officers as well.
7      Q.  So -- and this is just jumping ahead a little
8  bit.  So I show you as having worked in San Bernardino
9  between '95 and 2010; is that right?
10     A.  Correct.
11     Q.  Do you know roughly how -- how large the
12 Department of Behavioral Health for San Bernardino was at
13 that time?
14     A.  I'm not certain about the Department of
15 Behavioral Health.  I know the jail.  I know the size of
16 the jail, but the Department of Behavioral Health was a
17 different county department, so I'm not aware of their
18 size.
19     Q.  But did they have -- it seemed like they had at
20 least -- well, they had several full-time mental health
21 professionals on call, on staff?
22     A.  At the Department of Behavioral Health, I assume
23 they have a hundred or more --
24     Q.  Okay.
25     A.  -- mental health professionals.  It's a large

Page 17

1  county.
2      Q.  So this line of questioning was about specific
3  mental health training.  You've told me about NCCHC
4  seminars.  We'll just call them in-service training
5  through San Bernardino County.  If you like a better term,
6  please let me know.
7      A.  No.  That works.
8      Q.  Anything else?
9      A.  Same thing for Orange County.  When I first
10 started my career in correctional health, I was getting
11 training from the Orange County health care agency as part
12 of my role as a staff nurse at the jail.
13     Q.  Same question, I asked you about roughly the
14 size of the Orange County health care agency in terms of
15 how many mental health care professionals they have, if
16 you know.
17     A.  Again, the health care agency is a pretty big
18 organization in Orange County.  The behavioral health
19 division, again, provided services not only in the jails,
20 but in the community, so I would assume their staffing was
21 in the hundreds.
22     Q.  Any other training specific to mental health
23 that you can think of?
24     A.  No.  Not off the top of my head.
25     Q.  All right.  You've listed on your CV several

Page 18

1  certifications and awards, and I wanted to ask you briefly
2  about some of these.  One of the certifications or
3  professional affiliations is service on the California
4  Board of State and Community Corrections in January of
5  2016.  And it looks like you're a co-chair of the medical
6  and mental health workgroup for adult Titles 15 regulation
7  revision.
8       Now, that sounds very specific and specialized
9  and I was wondering if you could help me understand what
10 you were doing with that?
11     A.  Right.  In California the California Board of
12 State and Community Corrections provides jail standards
13 for local detention facilities.  So on a like a biannual
14 basis, they -- they review those standards.  They bring in
15 subject matter experts to look over the standards and
16 recommend any revisions that might be needed.  Since my
17 area of expertise was in health care in jails, I was a
18 co-chair for the medical and mental health standards that
19 year.
20     Q.  Okay.  So for 2016?
21     A.  For 2016, yes.
22     Q.  So does that mean you're helping to revise
23 standards or assess compliance or both?  Can you help me
24 with that?
25     A.  No.  It was a standard revision process, so we

Page 19

1  were -- we were looking at the standards that were in
2  place at that time, looking at areas that we felt could
3  use improvement or needed to be changed based on, you
4  know, current circumstances and what was going on.
5       And then we would -- we would make
6  recommendations for change, which were then open to the --
7  for public comment.  And then -- and then they would
8  come -- they would come back to the -- to the -- the
9  workgroup, and we would then make revisions and recommend
10 it.  And then it would go to the -- to the state to
11 actually approve it.
12     Q.  Okay.  And then I have the California Health
13 Care Foundation Cohort VII.  Is that the same as was
14 listed in your education above?
15     A.  Yeah.  That's the same.
16     Q.  Okay.  And then I have on the certifications, a
17 certified correctional health care professional and a
18 certified correctional health care professional, hyphen,
19 RN.
20     A.  Right.
21     Q.  And I was hoping you could explain to me what
22 those are, and what is the difference, if any, between
23 those two designations.
24     A.  Sure.  Again, it's the Nation Commission on
25 Correctional Health Care, NCCHC.  They do a certified -- a

Page 20

1  correctional health professional certification program.  I
2  took the general CCHP test in 1991, and I maintained that
3  since that time.  But then in 2014, I then specifically
4  took the CCHP required testing as a correctional nursing
5  professional.
6      Q.  Are they separate designations?
7      A.  Yes.  The CCHP is just a general understanding
8  of the standards that apply to correctional facilities.
9  And the RN certification is specific to nursing, so
10 there's a lot of specific nursing scenarios:  Patient
11 comes to you with X, Y, Z.  You know, what would you do?
12 That sort of thing.
13     Q.  The RN designation, had it been in existence
14 since 1991?
15     A.  No.  No.  In 1991, when I originally took it,
16 they just had CCHP.  They have since added designations
17 for MDs, for mental health professionals, for RNs.  I
18 can't think what else.
19     Q.  Do you know when it was that the subsequent
20 designations for RNs and MDs sort of became available?
21     A.  It's pretty close to the time I took it.
22     Q.  Okay.  I want to loop back and talk about your
23 professional experience for a few minutes.  The first
24 nursing job or professional job I have for you is in
25 St. Joseph's Hospital in the med-surg unit.  Was there any

Page 21

1  correctional health care affiliated with this position?
2      A.  No.  It was an acute care hospital.  I worked
3  originally as an LVN, and then I went on in 1984 and got
4  my registered nursing degree.  And then I went to work --
5  I changed my designation as an LVN to a registered nurse
6  and stayed for another year, so . . .
7      Q.  All right.  Then I see in 1985, you went to
8  Orange County Health Care Agency Correctional Medical
9  Services.  Was that your first position in correctional
10 health care?
11     A.  It was, yes.
12     Q.  And you've listed your position as senior
13 comprehensive care nurse.  What was involved in that?
14     A.  Well, I originally started as a staff nurse, a
15 floor nurse within the first the year, so I was promoted
16 to a senior comprehensive care nurse, which is more like a
17 charge nurse, sort of -- you're still doing patient care,
18 but you're responsible for your shift.  So, you know, if
19 other nurses needed assistance or -- or the sheriff had an
20 issue with something going on with the patient, you would
21 get involved with that.
22      Also, during that time as a senior, I -- I got
23 involved in policy and procedure revision, and I was
24 involved in the first set of nursing protocols that were
25 written and put in place in the Orange County jails during

Page 118

1  general questions, and then we can get into the specifics.
2  Does the medical staff require the cooperation of the
3  correctional staff to facilitate an emergency
4  transportation of an inmate to a hospital?
5      A.  Generally, yes.  Nurses or medical people
6  wouldn't themselves call for an emergency response EMS or
7  911, but they would have a correctional officer do that.
8      Q.  Okay.  So the correctional officer generally is
9  the one who calls dispatch to get an ambulance over?
10     A.  Correct.  Correct.  There's reasons for that,
11 one of which is -- is custody needs to know that an
12 ambulance is coming so they're prepared to get them in and
13 get them to the patient, so -- and nurses are generally
14 busy with the patient providing care, so they -- we would
15 always ask the officer, "Call for an ambulance," or, "Call
16 911."
17     Q.  Okay.  And the medical staff couldn't just take
18 the patient out of the facility straight to the hospital.
19 Would that be true?
20     A.  That would never happen.
21     Q.  Okay.  All right.  If we go to page 29 of your
22 report, we have a time line that you provided.  12:05
23 Ms. Powell returns to jail and notes Keaton is a little
24 bit more -- or appears more lethargic than he was in the
25 morning and calls provider to see him in clinic later due

Page 119

1  to his worsening condition.  And you state, "She failed to
2  assess him for over an hour, and she left him to do med
3  pass."  All right.  What's your source for that
4  information?
5      A.  I believe that came from her -- from her
6  incident report.  She wrote an incident report after the
7  fact, and I think I took most of that verbatim from her
8  report, where she said, "At approximately 12:05, I came
9  back into the jail for my shift, and Inmate Schomer seemed
10 more lethargic."
11     Q.  Okay.  And then she goes to do med pass and then
12 comes back about an hour later and does vitals.  That's
13 your understanding of the chronology there, correct?
14     A.  Yeah.  She goes to the med pass, and she notes
15 in her incident report that the other MA attempted to get
16 vital signs but was unsuccessful, so she went back at
17 1:10, 13:10, and got vital -- got that blood pressure of
18 96/60.
19     Q.  And you think it was another medical assistant
20 that was trying and failing to get vitals?
21     A.  It says, "We made the call . . . ."  It says,
22 "They also attempted to get vitals but were unsuccessful."
23 Maybe she's referring to the deputies trying to get vital
24 signs.  I think the deputies were also able to use the --
25 the Dinamap machine that takes blood pressure and things.

Page 120

1  So she went back at 13:10 to get a blood pressure.
2      Q.  Okay.  And then do you know what time Dr. Rachot
3  ordered transport to the hospital?
4      A.  It looks like she called them at 13:17.  So she
5  got the -- she got the blood pressure and pulse at 13:10,
6  1:10.  She called Dr. Rachot at 1:17, and that's when he
7  said, "Send him to the hospital" -- "send him to the
8  hospital via ambulance."
9      Q.  And do you know from there what time EMS was
10 actually contacted?
11     A.  They weren't contacted -- they weren't contacted
12 until 1:38, which would be about 21 minutes later.
13     Q.  All right.  So if I understand from your report,
14 your criticism is that Bailey Powell should not have left
15 Keaton in his cell after EMS was called?
16     A.  No.  Because at the time she called -- at the
17 time she got this blood pressure, which was now becoming
18 critically low for this patient and heart rate was
19 elevated, she should never have left this patient.  She
20 should have stayed with him until EMS arrived.
21         But not only did she leave to go do another
22 task, which is pass meds in the rest of the facility, the
23 deputy left to go book another inmate before he bothered
24 to call for transport.  And that created a delay from
25 about a half hour from -- it created a one-half-hour delay

Page 121

1  from the time Dr. Rachot said, "Get him to the hospital,"
2  until EMS finally came.
3      Q.  When Bailey left to do the med pass, was Keaton
4  alone?
5      A.  I think he was with an officer.
6      Q.  Okay.
7      A.  But still, she was the medical person at that
8  time.  She was the highest medical person at that time.
9  She needed to stay with her patient until EMS arrived.
10 Because remember, it was during this half hour when nobody
11 was there, no MA and no officer, that Mr. Schomer quit
12 breathing.  And when EMS arrived, he was in his cell with
13 no pulse, no respirations.  He had vomited.  He was
14 effectively dead when they got there.
15     Q.  So are you -- this is the only way I have to
16 phrase it, and I don't mean this to come across the wrong
17 way.  Are you projecting a nurse's level of care on
18 Ms. Powell when you say, "She should have stayed.  She
19 should have done this and that on that day"?
20     A.  No.  No.  Whether she was an MA, an LPN, or an
21 RN, or a mid-level, or a doctor, you don't leave a patient
22 in a critical state like this and go do something else.
23 You wait for EMS to arrive, and you continue to monitor
24 them.  She could have continued getting vital signs.  She
25 could have, you know, gotten him into a position.

Page 122

1    It appears he was in a position where he ended
2    up vomiting, and then they found -- we don't know.  Maybe
3    if she'd got him in a position where he safely vomited
4    and -- and didn't have to potential to aspirate -- I mean,
5    I don't know.  But you don't leave a critically ill
6    patient alone, whether you're an MA, RN, a mid-level, a
7    doctor.
8        Q.   Can you say more likely than not if Bailey
9    Powell had been present, she would have been able to
10   render life-saving care?
11       A.   Of course she could have, because she certainly
12   would have at least have CPR training.  She -- she could
13   have gotten him into a position that made it easier for
14   him to breathe, perhaps, or when he vomited, it didn't
15   stay in his mouth or aspirate.  Yes.  If she'd stayed with
16   him, she could have prevented this from happening.
17       Q.   So you said she could haven gotten him into a
18   position where it was easier breathe, perhaps.
19       A.   I don't know.  I don't know because nobody was
20   there with him until EMS arrived and found him dead in his
21   cell.
22       Q.   Do you know, is there published literature or is
23   it known within your community of expertise what
24   percentage of CPR attempts are successful?
25       A.   I don't know that I can give you a percentage,

Page 123

1    but I've seen plenty of patients who've had CPR in a
2    timely manner and recovered.
3        Q.   Does it matter what type of arrest the patient
4    has, cardio versus pulmonary?
5        A.   No.
6             MR. SCHULLER:  Objection.  Form, foundation.
7             THE WITNESS:  No.  It's like the A, B, Cs.  You
8        know, you make sure that there's an airway.  You make
9        sure they're breathing.  You make sure there's
10       circulation, which would be heart -- heartbeat.  It's
11       all part of CPR.
12            And, you know, I wouldn't expect an MA, I
13       wouldn't expect an LPN or RN to be able to determine
14       that either.  But I would expect them to be able to
15       determine if a patient's heart quits beating or if
16       they quit breathing.  She even documents in her note
17       that she couldn't feel a radial pulse, so that --
18       that tells me his pulse was so weakened or
19       compromised at that period of time that she needed to
20       stay with him.
21   BY MR. LUSTY:
22       Q.   So am I to understand from your testimony that,
23   in your opinion, the odds of success from CPR are equally
24   the same if it's a cardial arrest as it is from a
25   pulmonary arrest?

Page 124

1             MR. SCHULLER:  Objection.  Misstates prior
2        testimony.
3             THE WITNESS:  Yeah.  You have to ask a physician
4        that.  I don't know.
5    BY MR. LUSTY:
6        Q.   Okay.  Do you know what it was that immediately
7    provoked his arrest?
8        A.   No.
9        Q.   Okay.  Do you know the level of -- Oh, sorry.  I
10   think I probably asked you this.  I apologize.  I'll skip
11   that question.
12            So the criticism with respect to the emergency
13   response was that Bailey left Keaton at noon.  Is that the
14   criticism, or is that part of the criticism?
15       A.   No.  She came back to the jail at noon.
16       Q.   Okay.
17       A.   She went and got vital signs at 1:00, 10 past
18   1:00.  She called Dr. Rachot, who said, "Send him to the
19   hospital in an ambulance," and then she went off to do her
20   med pass.  That's my criticism.  She -- she left him
21   alone.
22       Q.   All right.  That's what I was trying to
23   understand, where the criticism begins and ends, and it's
24   having left him at 1:17 or just after, correct?
25       A.   Correct.

Page 125

1             MR. LUSTY:  Okay.  All right.  We've been going
2        over an hour.  I need to take another break, and then
3        we'll go to the rebuttal report, and I'm nearing the
4        end of my examination.  So why don't we reconvene
5        in -- on the hour is that good for everyone?
6             THE WITNESS:  Okay.  Perfect.
7             MR. SCHULLER:  Thanks, Ben.
8             (Pause in the proceedings.)
9             (Exhibit 7 [Rebuttal Report] was marked for
10       identification.)
11   BY MR. LUSTY:
12       Q.   All right.  I'm in the home stretch, Ms. Wild.
13            All right.  We'll mark as Exhibit 7 the rebuttal
14   report, and what I have is marked -- has Bates numbers
15   Wild 38 through 42.  Is that what you have?
16       A.   Yep.  I got it open.
17       Q.   And it's five pages, correct?
18       A.   Correct.
19       Q.   Okay.  We'll start with the first response to
20   Dr. Jones opinion, and it sort of, I think, ties in to the
21   second opinion.  But we'll get into this a little with
22   just the idea of when a patient can and cannot refuse
23   care, and I think we'll start with schizophrenia and
24   bipolar disorder.
25            You phrased in your report that, quote, a

Page 134

1  licensed in California and Arizona.  You've never worked
2  as a nurse in Nevada; is that true?
3       A.   That is true.
4       Q.   Do you have the document marked "Mental Health
5  Crisis Packet, Adults"?
6       A.   Yes.
7       Q.   This has got a Nevada revised statute.  I take
8  it you've never worked with this particular form before?
9       A.   No.  No.  I have never seen this before.
10          MR. LUSTY:  Okay.  Then that's all the questions
11      I have.  Thank you, Ms. Wild.
12          (Discussion off the record.)
13          THE COURT REPORTER:  I just need to know who all
14      is ordering the transcript.
15          MR. RYMAN:  Michelle, this is Brent Ryman.  I'll
16      take one of those, and I will put my email in the
17      chat so you'll see that as well.  Although I think
18      we've ordered from you guys before, so maybe you
19      already have it.
20          THE COURT REPORTER:  Yeah.  I think it's on the
21      notice too.
22          MR. RYMAN:  Okay.  I'll take one.  Thank you.
23          THE COURT REPORTER:  Thank you.
24          MR. LUSTY:  Electronic for me, Michelle, please.
25          MR. SCHULLER:  Electronic for me well, please.

Page 135

1          THE COURT REPORTER:  Okay.
2          MR. STANTON:  None for me at this time.
3          MR. KILLPACK:  And I don't need one either.
4  Thank you.
5          (The deposition was concluded at 3:19 p.m. MDT.)

Page 136

1                          ---o0o---
2
3       I, KATHRYN J. WILD, do hereby declare under
4  penalty of perjury that I have read the foregoing
5  deposition; that I have made any corrections as appear
6  noted, in ink, initialed by me, or attached hereto; that
7  my testimony as contained herein, as corrected, is true
8  and correct.
9
10          EXECUTED on this _____ day of _____,
11      2025, at _____, _____.
12
13
14                          _____
                                    KATHRYN J. WILD

Page 137

1                     CERTIFICATE OF REPORTER
2                          ---o0o---
3
4       I, Michelle A. Manni, Registered Professional
5  Reporter, certify:
6       that the foregoing proceedings were taken before
7  me at the time and place therein set forth, at which time
8  the witness was put under oath by me;
9       that the testimony of the witness, the questions
10 propounded, and all objections and statements made at the
11 time of the examination were recorded stenographically by
12 me and were thereafter transcribed;
13      that a review of the transcript by the deponent
14 was requested;
15      that the foregoing is a true and correct
16 transcript of my shorthand notes so taken.
17      I further certify that I am not a relative or
18 employee of any attorney of the parties nor financially
19 interested in the action.
20      Dated this 26th day of March, 2025.
21                                      *Michelle A. Manni*
                   [MICHELLE A MANNI NOTARY PUBLIC MINNESOTA
                   My Commission Expires January 31, 2027]
                   _____
22                          Michelle A. Manni, RPR