UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DWAYNE L. SCHOMER, et al.,

Plaintiffs,

v.

SHERIFF AITOR NARVAIZA, et al.,

Defendants.

Case No. 3:23-cv-00390-ART-CSD

ORDER

(ECF NOS. 68, 70, 71, 72)

Plaintiffs Dwayne L. Schomer, individually and as administrator of the estate of his son Keaton M. Schomer, and Braylen Schomer, Keaton's sister, bring claims related to Keaton's wrongful death. (ECF No. 29-1.) Before the Court are four motions for summary judgment. (ECF Nos. 68, 70, 71, 72.) The motions are filed by Sergeant Michael Silva (ECF No. 68); Elko County, Sheriff Aitor Narvaiza, and Undersheriff Justin Aimes ("Elko County Defendants") (ECF No. 71); Medallus & Vacarothone LTD, Dr. Rachot Vacarothone, and Medical Assistants Bailey Powell, Geoffrey Fisher, Mercedes Cochrell, and Letiscya Chacon ("Medallus Defendants") (ECF No. 70.); and Sheriff Deputies Trevor Sneed, Douglas Holladay, Erika Gonzalez, David Hatch, and Hannah Kendall ("Deputy Defendants"). (ECF No. 72.) The Court grants in part and denies in part all four motions.

## I.    BACKGROUND

### A.    Sequence of Events

Keaton Schomer, the Plaintiffs' son and brother, was 26 years old when he died in custody at the Elko County Jail on September 5, 2021.

Keaton was detained at the jail on two relevant occasions in the summer of 2021. The first was from July 30 to August 19, 2021, during which contract medical staff and jail staff had opportunities to observe his health and his

behavior. (ECF No. 83-9.) The second began on August 23, and ended when Keaton died on September 5. (*Id.*)

During both of Keaton's periods of detention, Deputy Sheriffs and Medical Assistants had the most regular contact with him. Deputies were employees of the county jail, while Medical Assistants were employees of a contractor called Medallus and Vacharothone LTD ("Medallus"). Medical Assistants passed medications, reviewed kites, and addressed detainee messages and requests. (ECF No. 68-3.) As unlicensed medical professionals, they were supervised by and received instructions from licensed providers, including Dr. Rachot Vacharothone, the president and CEO of Medallus, and nurse practitioners. (*Id.*) Although medical assistants were not able to make decisions such as recommending admission to a hospital on their own, providers were always available for medical assistants to call, and the providers could make treatment decisions in consultation with the medical assistant over the phone. (*Id.*)

Throughout Keaton's first period of incarceration, medical staff and jail staff consistently noted that he refused to eat, drink, or take medication, and that he had mental health needs. (ECF Nos. 82-14; 82-9; 82-9). Deputy David Hatch booked Keaton in on July 31, and noted at intake that Keaton said that he was bipolar. (ECF No. 82-27.) On the same day, Keaton's father, Plaintiff Dwayne Schomer, called the jail and told MA Letiscya Chacon to tell her that Keaton was both bipolar and schizophrenic and needed medication. (ECF No. 82-9.) MA Chacon faxed Keaton's pharmacy, but there is no record that any response was ever received (*id.*), nor did she recall any response when she was deposed. (ECF No. 82-11 at 10.) While the record does show that Keaton was prescribed several medications for gastrointestinal issues during this period of detention, the only anti-psychotic listed in the record appears to have been dispensed during a prior detention three years earlier. (*See* ECF No. 82-9 at 6.) Keaton was released almost three weeks after booking, on August 19.

After a short period of liberty, Keaton was arrested at a hospital for battery and other charges and re-detained at the jail on August 23. (ECF No. 84-6.) He stayed there until September 5, the day of his death. There are no records dating from this period that indicate that he was provided or offered antipsychotic medication, nor any medical notes indicating that a licensed medical provider saw him in connection with his mental health. Neither did any defendant testify that they remember a licensed medical provider seeing him. (ECF No. 82-13.) The only evidence in the record suggesting that Keaton may have been seen by a licensed provider is a handwritten psychiatric clinical schedule, on which his name was written and then crossed out. (ECF No 980-3 at 14.)

When Keaton was booked into the jail on August 23, MA Bailey Powell completed a "Pre-booking Triage Form Medical/Mental Health." (ECF No. 82-16.) Question 10 on the form asks: "Does the detainee appear to be hearing voices, seeing things that are not present, or overly suspicious or paranoid?"). *Id.* MA Powell checked the box "yes" and noted that Keaton was seeing colors and hearing people talking. (ECF No. 82-16). The form instructs, "If Yes: Transport to Hospital." (*Id.*) Keaton was not transported to the hospital. (ECF No. 82-16.)

On August 26, MA Geoffrey Fisher noted that Keaton appeared dehydrated, that he refused Pedialyte because it was not blue Gatorade, that he did "not appear to have desire to survive and thrive," and that he said the water and food were "no good." (ECF No. 83-9.) On August 28, MA Chacon noted that his lips were dry and cracked, that he said he was dehydrated, that he refused water because he thought that it was poisonous, and that he refused Pedialyte again because it was not blue Gatorade. (*Id.*)

In the early morning hours of August 29, Deputy Douglas Holladay called MA Powell because Keaton said he didn't feel well and needed to go to the hospital. (*Id.*) He took Keaton to medical in a wheelchair for an IV. (ECF No. 83-19.) It took MA Powell over ten minutes to insert the IV line. (*Id.*) Keaton received

about 800 ccs of fluid before he refused the rest of the IV and took some sips of water. (ECF No. 83-9.) Keaton told Deputy Holladay and MA Powell that he was going to die and that he wanted to go to the hospital. (ECF No. 83-19 at 7:10-23.) Later that day, Keaton repeated to MA Chacon that he wanted to go to the hospital and declined Pedialyte. (ECF No. 83-9.) MA Chacon also observed that Keaton had "a lack of ambition to nourish himself." (*Id.*)

That night, Deputy Holladay noted that Keaton continued to refuse meals and water served in a cup. (ECF No. 81-10.) He twice gave Keaton bottled water so that Keaton would drink. (*Id.*) Throughout the night of August 29 to the morning of August 30, Keaton "continue[d] to demand help from deputies, asking for water, stating 'he is going to die' and 'he needs to go to the hospital.'" (*Id.*) Deputy Holladay expressed concern that Keaton's mental state was deteriorating because he was not eating or drinking, and that he was intentionally refusing food and water so that he could go to the hospital and escape custody. (*Id.*) In the morning of August 30, Deputy Holladay wrote up his concerns in a memo and sent it to his direct supervisor, then-Lieutenant and now-Sergeant Michael Silva (ECF No. 68-1), with the note, "Sir, I am only sending this to you because I feel like the issue is going to get worse." (*Id.*) Neither Deputy Holladay nor Sergeant Silva recall that Sergeant Silva replied. (ECF No. 81-6 at 15.)

From August 30 to September 4, medical staff and jail staff continued to observe that Keaton was refusing food, water, and medications, that he was dehydrated, and that he continued to ask to go to the hospital. (ECF Nos. 83-9; 83-3.)

On September 4, Medallus staff again observed that Keaton refused medical attention and medication. (ECF No. 83-9.) MA Powell asked him to sign an Against Medical Advice (AMA) form, which stated he was choosing to decline treatment for his "serious medical condition and its potentially dangerous

complications" and that he assumed full responsibility for the outcome. (ECF No. 82-19.) Keaton refused to sign. (*Id.*)

The night of September 4, Deputy Holladay heard Keaton ask to go to the hospital. (ECF No. 72-7 at 49.) Deputy Holladay called medical personnel, gave Keaton four bottles of water, and watched him drink. (ECF No. 72-7 at 49-50.) He observed that Keaton's mental status had deteriorated over time, which he again attributed to refusing meals, medications, medical service, and water. (ECF No. 84-19.) Deputy Holladay recalled that over the time of his incarceration, Keaton got more lethargic and slow in small steps. (ECF No. 83-5 at 13.) In the morning of September 5, Deputy Holladay told Sergeant Silva that Keaton may need to go to the hospital soon. (ECF No. 72-7 at 21.)

Sergeant Silva's only response in the record to Deputy Holladay was to question why he was still at the jail after his shift. (*Id.* at 22.) Sergeant Silva, explaining his nonresponse, said that since he was the lieutenant in charge at the time, "I don't need to tell a deputy what I am going to do or not do." (ECF No. 81-6 at 19.) By this point in time, Dr. Vacharothone had asked Sergeant Silva if jail staff could help force Keaton to eat and drink. (ECF No. 81-24.) Dr. Vacharothone later recalled that "the result [of that conversation] was, we can't violate his civil right. As long as he is competent, we need to get a court order going." (*Id.*)

On September 5 around 12:05 p.m., MA Powell observed that Keaton seemed more lethargic than before, and that his eyes were rolled back. (ECF No. 83-9.) She and MA Chacon decided to have him seen by a medical provider during the regular 3:00 p.m. rounds "due to his worsening condition." (*Id.*)

At 12:12 p.m., MA Powell told Deputy Trevor Sneed that Keaton didn't look well. At that point, Deputy Sneed knew that Keaton was sometimes refusing food and water, but having had limited contact with him in the past, he wasn't sure of the extent of the problem. (ECF No. 72-9.) Deputy Sneed and Deputy Hannah

Kendall then entered Keaton's cell. (ECF Nos. 83-4 at 145:08-148:10; 83-2 at 131:4-23; 83-10). In her deposition, Deputy Kendall reports that he was lying on the floor in an unnatural position, verbally unresponsive, and not looking like he could get up from the ground. (ECF No. 83-3 at 21-27.) Keaton's feet were discolored, his breathing was labored, his eyes were rolling back into his head, he was very pale, he was "absolutely lethargic," he was obviously dehydrated, and his mouth was full of mucous. (*Id.*) Deputy Kendall tried to engage him in conversation so that he would not lose consciousness. (*Id.*)  She says that he looked "very unwell," and "we knew he was sick … but we didn't know how bad." (*Id.*) Deputy Sneed attempted to get Keaton's attention by calling his name out loud. (ECF No. 84-6.) Keaton didn't respond to his name at first, but after Deputy Sneed had said it a few times, he moved his eyes to look at Deputy Sneed. (*Id.*) Under the impression that he could receive an IV at the jail, and concerned about the staffing levels, Deputy Kendall said to Keaton, "we have to do everything here before we take you to the hospital." (ECF No. 83-3.)

Around 12:35 p.m., Deputy Sneed bought Keaton a Gatorade and water, and gave Keaton his own lunch, which was microwaveable macaroni and cheese. (ECF No. 72-9 at 30-31.)

Around 12:46 p.m., Deputies Sneed and Kendall returned to attempt to get Keaton to eat and drink. (ECF No. 84-6.) They helped Keaton get up off the floor into a sitting position. (ECF No. 83-4 at 146.) Keaton took a sip of Gatorade. (*Id.* at 44.) Deputies Sneed and Kendall attempted to pour water down his throat, much of which he spat out. (ECF No. 83-14.) Deputy Sneed attempted to obtain Keaton's vital signs, but didn't succeed. (ECF No. 83-4 at 44-45).

Deputy Sneed testified that "I had never seen anybody go this long in my career without eating or drinking or being in this type of state. It was completely new to me. I was starting to get really concerned." (ECF No. 72-9 at 15.) Although he could not remember at what time he did this, in response to Keaton's

6

condition, Deputy Sneed used the booking computer to read up about in-custody deaths, including deaths by starvation. (ECF No. 72-9 at 15.)

At approximately 1:10 p.m., MA Powell returned to Keaton's cell to assist with checking his vitals. (ECF No. 83-9.) MA Powell then called Dr. Vacharothone to report on Keaton's condition.

Ten minutes later, MA Powell told Deputies Sneed and Kendall that Dr. Vacharothone had said that Keaton needed to be sent to the hospital. (*Id.*) MA Powell then added, "I just don't know what you guys are going to do because you are short," referring to a staffing shortage. (ECF No. 83-14.) Not wanting to leave the jail staffed with only one deputy, Deputy Sneed called off-duty staff to come bring Keaton to the hospital. (ECF Nos. 83-9; 83-4 at 50-51.) In the meantime, MA Powell and Deputy Kendall continued dispensing medications to other detainees, leaving Keaton alone. (ECF Nos. 83-4 at 38; 72-1 at 21.) At 1:22 p.m., Nevada Highway Patrol arrived at the facility with an arrestee for booking. (ECF No. 83-4 at 48.) Deputies Sneed and Kendall and MA Powell all participated in the booking process. (ECF No. 83-14.) Deputy Kendall testified in her deposition that she and Deputy Sneed could have told the NHP trooper that they could not do the booking at that time, but they did not do so. (ECF No. 83-3 at 39) ("He could have been told that he needed to wait for however long.")

Around 1:38 p.m., after the booking was complete, Deputy Sneed called for an ambulance. (ECF No. 83-4 at 50-52). At 1:43, the Fire Department arrived. (ECF No. 84-6.) At 1:45, Deputy Sneed brought the first responders to Keaton's cell. (*Id.*) He was in the same position as when they had left him alone about an hour earlier, pulseless and unresponsive. (*Id.*) Paramedics attempted CPR and life-saving measures. (*Id.*) At 2:09 p.m., Keaton was pronounced dead. (*Id.*) The cause of death was complications from dehydration. (ECF No. 84-7.)

On September 9, Deputy Holladay prepared a draft of a memo in which he stated that: "It is my belief that due to a lack of 'Training', a lack of 'Experience'

with dealing with the mentally ill, and a lack of guidance from our Leader in the Detention Facility, we all failed to perform one of our most important tasks, that is the Health and Safety of all Inmates." (ECF No. 84-19.) Sergeant Silva is the leader referred to in this memo. (ECF No. 81-7 at 12.) Sergeant Silva agreed that there was a lack of training and experience in dealing with the mentally ill at the jail. (ECF No. 81-6 at 20.)

### B.    Relevant Policies and Leadership

At all relevant times, Medallus and Elko County had an Agreement for Inmate Medical Services (ECF No. 81-3), which set forth the responsibilities of the jail and Medallus. The contract provides that in the normal course of operation of the jail, certain detained and incarcerated persons will need medical care, and that Medallus will provide medical care under the terms and conditions of the contract. (*Id.*) Notably, when necessary, Medallus was to "recommend admission to the local hospital and/or arrange for such specialized services." (*Id.*) Jail staff would supervise all medical staff visits and examinations. (*Id.*)

A number of Elko County Detention Center (ECDC) policies and procedures dictated employee responsibilities relative to medical and mental health care. These policies required and empowered jail staff to seek a higher level of medical attention for a detained person, including hospitalization, where necessary, without supervisor approval (ECF Nos. 84-12; 84-8; 84-13) (ECDC Policy 631; 640; and 623), needing to explain the reason for transport to hospital (ECF No. 84-13) (ECDC Policy 640), or regard to security concerns (ECF No. 84-14) (ECDC Policy 663).

1. Inmate Booking and Release, ECDC Policy 623, requires isolating and supervising those with medical or mental problems, and provides authority for releasing severely sick inmates to the hospital. (ECF No. 84-12.)

8

2. Inmate Services and Programs, ECDC Policy 631, provides that "[o]n an emergency basis staff must act without the determination of a supervisor and make the necessary arrangements. This would include the contact of the appropriate mental health provider in a situation where an inmate, left untreated, could harm himself or someone else." (ECF No. 84-8.) Sergeant Silva agreed in his deposition that anyone at the jail could initiate sending an inmate to the hospital in an emergency. (ECF No. 81-6 at 41-42.)

3. Transportation of Inmates, ECDC Policy 640, provides that deputies can transport inmates to hospital for necessary treatment. (ECF No. 84-13.)

4. Hospital Duty, ECDC Policy 663, provides in relevant part that "Deputies must realize that medical emergencies take precedence over security." (ECF No. 84-14.).

Sheriff Aitor Narvaiza signed off on all the policies. Sergeant Silva participated in the preparation of Prisoner Medical Care and Billing, ECDC Policy 637, and Transportation of Inmates, ECDC Policy 640. (ECF No. 81-6 at 24-25.)

The Sheriff is bound by an additional policy, Prisoner Medical Care and Billing, ECDC Policy 637, which requires at least quarterly meetings between the health authority and the Sheriff regarding medical problems. (ECF No. 84-9) This policy also addresses intake screenings and ongoing screenings, and states that the "health authority, dentist and psychologist make the sole judgment on medical, dental and mental health treatment." (*Id.*)

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting analysis. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the non-movant will bear the burden of proof at trial. *See id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.* (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the non-

moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First Nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson*, 477 U.S. 242 at 250. "If, as to any given material fact, evidence produced by the moving party... conflicts with evidence produced by the nonmoving party ... we must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). If reasonable minds could differ on material facts, summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary trials only when the material facts are undisputed; if not, the case must proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995) (citing *Lindahl v. Air France*, 930 F.2d 1434, 1436 (9th Cir. 1991)).

## III.   DELIBERATE INDIFFERENCE AND QUALIFIED IMMUNITY

The estate of Keaton Schomer sues all Defendants for deliberate indifference to Keaton's serious medical needs. Sergeant Silva; the Sheriff Deputies; the Sheriff, Undersheriff, and Elko County ("Elko County Defendants"); and Medallus Medical Assistants all move for summary judgment on this claim.

Sergeant Silva and the Sheriff Deputies, who were all county employees working on-site at the Elko County Jail, assert that they should be granted

summary judgment because they were not deliberately indifferent to Keaton's serious medical needs, and because they are entitled to qualified immunity.

### A. Governing Substantive Law

#### 1. Deliberate Indifference

"When an individual is taken into custody and thereby deprived of [his] liberty, the officials who hold [him] against [his] will are constitutionally obligated to respond if a serious medical need should arise." *Conn v. City of Reno,* 591 F.3d 1081, 1091 (9th Cir. 2010). The Fourteenth Amendment secures pretrial detainees' rights against official deliberate indifference to their serious medical needs. *Id*; *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). These rights are "at least as great" as the Eighth Amendment protections available to convicted prisoners. *Maddox v. Los Angeles,* 792 F.2d 1408, 1414 (9th Cir.1986); *see also Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). Either action or inaction may lead to constitutional liability if an official is aware that a prisoner or pretrial detainee faces a substantial risk of serious harm, and nevertheless neglects that person's serious medical needs. *See Farmer v. Brennan,* 511 U.S. 825, 842 (1994).

Under the Fourteenth Amendment, deliberate indifference is measured by an objective standard. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069-70 (9th Cir. 2016); *Gordon,* 888 F.3d at 1124. "[A] pretrial detainee who asserts a due process claim for failure to protect [must] prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 1070–71. Altogether, the elements of a claim of deliberate indifference to a serious medical need are that the defendant:

> (1) "made an intentional decision with respect to the conditions under which the plaintiff was confined;"
> (2) the "conditions put the plaintiff at substantial risk of suffering serious harm;"

12

(3) the "defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of defendant's conduct obvious;" and
(4) "by not taking such measures, the defendant caused the plaintiff's injuries."

*Id.* at 1124-25.

Under the second prong of the *Gordon* test, courts look for an objective showing of substantial risk. In a medical indifference case, a person is at substantial risk when the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," or the risk derives from the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (internal quotations omitted); *Conn,* 591 F.3d at 1094. Defendants do not dispute that death is a serious harm. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1244 (9th Cir. 2010), *overruled on other grounds by Castro,* 833 F.3d at 1070.

Many cases are decided on the third prong of the *Gordon* test, which evaluates whether the defendant behaved with deliberate indifference. 888 F.3d at 1124-25. Whether an officer's carelessness rises to the level of deliberate indifference "will necessarily turn on the facts and circumstances of each particular case," *Id.* at 1125, and is typically a question for the fact-finder. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013). A plaintiff must first show that a reasonable officer would have appreciated that the detainee was at risk. *Id.* Officers' subjective knowledge of relevant facts at the time of the alleged violation may be part of a plaintiff's showing that officers could have reasonably apprehended the risk. *See Villarreal v. Cnty. of Monterey*, No. 16-CV-06672-LHK, 2018 WL 11606313, at *10 (N.D. Cal. Aug. 21, 2018).

Then, a plaintiff must show that defendants did not respond reasonably to that risk. *Gordon,* 888 F.3d at 1125.

Deliberate indifference to a serious medical need "may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Even where a medical treatment plan in in place, a passive plan that amounts to a "'wait and see'" approach "[a]t some point … becomes deny and delay." *Stewart v. Aranas,* 32 F.4th 1192, 1195 (9th Cir. 2022); *see Montano v. Orange Cnty., Texas,* 842 F.3d 865, 878 (5th Cir. 2016) (leaving a detainee without treatment for multiple days to "heal himself" amounted to an unconstitutional punishment). Officers may be deliberately indifferent for failing to provide care where a reasonable officer would have appreciated an obvious need for it. *Id.; Conn v. City of Reno,* 572 F.3d 1047, 1055 (9th Cir. 2009); *Clark-Murphy v. Foreback,* 439 F.3d 280, 290 (6th Cir. 2006) (upholding a denial of summary judgment where officers effectively denied a prisoner psychological treatment). In the face of an obvious medical need, officers may be liable even if they attribute their failure to provide treatment to security concerns, even if they passed on their concerns to other officers, and even if the decedent was seen by medical personnel. *Conn*, 591 F.3d at 1095-98. Delay of care may also amount to deliberate indifference. See *Hutchinson*, 838 F.2d at 394 (citing *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976)); *Hunt v. Dental Dept.,* 865 F.2d 198, 201 (9th Cir.1989) (reversing grant of summary judgment where officials delayed in providing dental care, and were aware that the unaddressed dental condition was causing severe pain and permanent damage); *Clement v. Gomez,* 298 F.3d 898 (9th Cir. 2002) (finding deliberate indifference where officers did not escort prisoners to showers until four hours after pepper spray vapors drifted into their

cells). Unconstitutional delay causes the unnecessary and wanton infliction of pain and suffering, and in the worst cases, death. *See Estelle,* 429 U.S. at 103.

Defendants assert that law enforcement officers are not deliberately indifferent if they reasonably rely on a trained medical professional's judgment. *Lemire,* 726 F.3d at 1084 (granting summary judgment to officers where the person in custody was already dead when they arrived on the scene, and medical professionals were attempting to revive him). While this is technically true, referral to trained medical professionals alone is not enough to shield state officials from constitutional liability. State actors cannot delegate their own constitutional responsibilities to medical personnel. *See Long v. Cnty. of Los Angeles,* 442 F.3d 1178, 1187 (9th Cir. 2006) (denying a county summary judgment by reasoning that municipalities should not be allowed to insulate themselves from liability for failing to adopt needed policies or provide necessary training to medical personnel).

Reliance on medical professionals must be reasonable under the circumstances. *Id.*; *see Conn,* 591 F.3d at 1101 (officers may have been deliberately indifferent to a decedent's risk of suicide notwithstanding the fact that the decedent had received multiple medical screenings); *Hamilton v. Endell,* 981 F.2d 1062, 1067 (9th Cir. 1992) (concluding prison officials may act with deliberate indifference when they "choos[e] to rely upon a medical opinion which a reasonable person would likely determine to be inferior") *overruled on other grounds in Estate of Ford v. Ramirez–Palmer,* 301 F.3d 1043, 1045 (9th Cir. 2002); *Clark-Murphy,* 439 F.3d at 290 (denying corrections officers summary judgment on deliberate indifference where a psychologist saw the prisoner multiple times, but medical attention did not prevent him from dying of thirst). "[A]ccess to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz v. Imperial,* 884 F.2d 1312, 1314 (9th Cir. 1989) (internal citations and quotation marks omitted) (reversing grant of summary

15

judgment on deliberate indifference to medical staff who knew of the decedent's head injury but disregarded symptoms of complications, and inappropriately prescribed sedatives that may have masked them).

Corrections officials "violate the constitution when they choose a medically unacceptable course of treatment for the circumstances." *Stewart*, 32 F.4th at 1194. In *Stewart*, a prisoner received minimal and inadequate treatment for serious medical issues, then complained to the director of the state department of corrections and the prison warden, and nothing improved. *Id.* at 1195. Where officials' failure to act caused him severe pain and lasting harm, the Ninth Circuit held that both the doctors and the corrections supervisors may be constitutionally liable for a "wait and see" approach to medical care that "at some point... becomes deny and delay." *Id.*; *Stewart v. Aranas*, No. 317CV00132MMDCLB, 2019 WL 8752334, at *1 (D. Nev. Dec. 10, 2019), *report and recommendation adopted*, No. 317CV00132MMDCLB, 2020 WL 1133253 (D. Nev. Mar. 9, 2020), *aff'd*, 32 F.4th 1192 (9th Cir. 2022). In *Dau*, a district court denied an officer summary judgment where he did not prevent his supervisees from following a nurse's unreasonable instruction to transport a detainee to the emergency room in a jail van that was not equipped with any medical personnel or medical equipment. *Dau v. Cnty. of Imperial*, No. 12CV0432 DMS PCL, 2013 WL 2295463, at *8 (S.D. Cal. May 24, 2013). In *Levingston*, a district court denied an officer summary judgment on deliberate indifference where he observed the decedent acting erratically, delayed in taking him to the hospital, and the decedent later passed away of a drug overdose. *Est. of Levingston v. Cnty. of Kern*, No. 116CV00188DADJLT, 2018 WL 1335410, at *6 (E.D. Cal. Mar. 15, 2018). This was despite the fact that the decedent continually and consistently denied taking drugs, and the officer sought out a fireman and a paramedic who both told him that the arrestee would be safe without emergency medical attention. *Id.*

Finally, the fourth and last prong of the *Gordon* test requires a plaintiff to show causation. 888 F.3d at 1124-25. If the injury would not have occurred "but for" the officers' conduct, then the officers' conduct is the actual cause of the injury. *Conn*, 591 F.3d at 1100. Officers' conduct must also be the proximate cause of the alleged injury, and no unforeseeable other cause can have superseded their liability for subsequent events. *Id.* at 1101. In other words, their conduct must be the "moving force" behind the harm. *Id.* "If reasonable persons could differ" on the question of causation then "summary judgment is inappropriate and the question should be left to a jury." *Lemire*, 726 F.3d at 1080-81 (quoting *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir.1990)). As a practical matter, a plaintiff who has demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation. *Id.* at 1080-81.

### 2.   Qualified Immunity

If a deliberate indifference claim against jail staff or supervisors survives summary judgment, the next question is whether they nonetheless are entitled to qualified immunity. Qualified immunity is not merely an immunity from liability, but also an immunity from suit. *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1098–99 (9th Cir. 1995). The doctrine of qualified immunity balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity defense allows for mistaken judgments and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* In so doing, it protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'"

17

*Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the *Saucier* analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (internal quotation marks and citations omitted). In step one, the court considers whether the facts "[t]aken in the light most favorable to the party asserting the injury ... show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. In step two, the court determines whether the right was clearly established at the time of the alleged violation. *Id.* The second step of the analysis is meant to encourage officers not "err always on the side of caution because they fear being sued." *Hunter*, 502 U.S. at 229 (internal quotations and citations omitted).

A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted). Whether a right is clearly established for the purposes of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The right must not be stated as a broad general proposition, but rather must be defined with enough specificity to put a reasonable officer on notice that his conduct is unlawful. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Officers can be on notice that their conduct is unlawful even in novel factual circumstances where their specific actions egregiously or obviously violates the general rule. *See Karl v. City of Mountlake Terrace*, 678 F.3d 1062,

1073 (9th Cir. 2012); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But "the farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016).

It is clearly established law that detainees have a right against official acts and failures to act that "deny, delay or intentionally interfere with medical treatment." *Hutchinson*, 838 F.2d at 394. The Ninth Circuit has denied qualified immunity to officers who have caused harmful and unreasonable delays in medical care, *Clement*, 298 F.3d at 906 (denying qualified immunity where officers delayed for four hours before escorting inmates who were affected by the drift of pepper spray to shower), and officers who have unreasonably denied care altogether. *Conn*, 572 F.3d at 1062 (denying qualified immunity where officers failed to mitigate an obvious risk of suicide). A "wait and see" treatment plan may amount to a violation of the clearly established right against denial or delay of care. *Stewart*, 32 F.4th at 1194.

It is also "clearly established" that corrections personnel and prison doctors alike "violate the constitution when they choose a medically unacceptable course of treatment for the circumstances." *Id*. Even if some care was provided, where a reasonable officer would know that the care was not sufficient to abate the risk, the officer may still be denied qualified immunity. *Id*; *see Clark-Murphy*, 439 F.3d at 290 (Even where a psychologist saw the decedent two times, referral "does not suffice to establish that [officers] are entitled to qualified immunity as a matter of law at this stage of the case given their repeated interactions with [the decedent] and repeated opportunities to assess the seriousness of the situation.")

### A.   Sergeant Silva

Taking the facts in the light most favorable to the nonmovant, a reasonable officer in Sergeant Silva's position would have appreciated the degree of risk to Keaton and taken action to mitigate that risk. Sergeant Silva argues that he relied on Medallus Medical to provide care, but a reasonable jury could find that his reliance was not reasonable under the circumstances, and that his inaction amounted to a denial of care. Sergeant Silva cannot be granted summary judgment on the issue of his Fourteenth Amendment violation or on qualified immunity, as his inaction may have violated Keaton's clearly established rights against denial of care.

Despite all the clear signs that action was needed, Sergeant Silva "did nothing to provide care for Schomer." (ECF No. 81-25.) Sergeant Silva was told at least three times that Keaton was at risk and was not receiving adequate care. Each time, he ignored the warning. *Conn*, 591 F.3d at 1101 (where a detainee told officers that she was going to kill herself, and they did nothing that reasonably could have helped her, the officers were deliberately indifferent.) Sergeant Silva decided not to do anything after being notified on August 30, 2021 by Deputy Holladay that Keaton said he was going to die and said that he needed to be taken to the hospital. (ECF No. 68-46) He again decided not to act when Deputy Holladay told him on the morning of September 5 that Keaton may need to go to the hospital. (ECF No. 68-47.) Furthermore, Dr. Vacharothone stated in his deposition that he asked Sergeant Silva if jail staff could help force feed Keaton. (ECF No. 81-24.) Sergeant Silva said that they would not be able to do that without a court order and took no further action. (*Id.*) Even where the doctor in charge told Sergeant Silva that Keaton needed a higher level of care than what he was getting, he failed to take steps to obtain such care. A jury could find that Sergeant Silva's inaction amounts to deliberate indifference.

20

Making all reasonable factual inferences in favor of the non-moving party, a jury also could find that Sergeant Silva's inaction caused Keaton's death. Sergeant Silva, who was then the lieutenant in charge of the jail, was in a position to take action that could have saved Keaton's life, and did not. *Lemire*, 726 F.3d at 1080-81 (quoting *White*, 901 F.2d at 1505) ("As a practical matter, plaintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation.")

Sergeant Silva is not entitled to qualified immunity at summary judgment because under Plaintiff's best facts, he knew that Keaton needed care but did not do anything to help him obtain it, which would violate Keaton's clearly established right against the outright denial of care. *Conn*, 591 F.3d at 1101 (denying qualified immunity to officers who failed to act when a decedent had clearly told them that she was going to end her own life, and then she did); *Ortiz*, 884 F.2d at 1314; *Hutchinson*, 838 F.2d at 394. Binding precedent establishes that merely providing access to medical professionals is not enough. *Long*, 442 F.3d at 1187; *Conn*, 591 F.3d at 1101; *Stewart*, 32 F.4th at 1194; s*ee also Clark-Murphy*, 439 F.3d at 290. The Ninth Circuit has made clear that state officials cannot delegate their constitutional responsibilities to medical personnel, and that reliance on medical personnel must be reasonable under the circumstances. *Conn*, 591 F.3d at 1101; *see also Clark-Murphy*, 439 F.3d at 290 (denying qualified immunity to officers on summary judgment where they had opportunities to assess the seriousness of the situation, notwithstanding the involvement of a treating psychologist); *Stewart*, 32 F.4th at 1194 (corrections officials and doctors alike could be constitutionally liable for defective urological care). A jury could find that Sergeant Silva violated this clearly established rule

21

by continuing to rely on Medallus Defendants to provide care despite Deputy Holladay and Dr. Vacharothone's warnings.

The cases that Sergeant Silva puts forward are distinguishable. Some involved officers' reasonable reliance on medical professionals who provided treatment that was responsive and proportional to the injury. *Millard v. Oregon Dep't of Corr.*, No. 2:12–cv–01244–SI, 2014 WL 2506470, at *7–8 (D. Or. June 3, 2014); *Barber v. Santa Barbara County*, No. CV-11–2365–DMG (MLG), 2011 WL 6951838, at *6 (C.D. Cal. Nov. 14, 2011), report and recommendation adopted, 2012 WL 27782. Here, a fact-finder could find that Sergeant Silva was on notice that Keaton faced an obvious, life-threatening risk, that the care provided wasn't adequate to meet the medical need, and that he was not reasonable to rely on Medallus Medical. *Estate of Prasad ex rel. Prasad v. County of Sutter*, is not on point because officers there prevented the detainee from receiving medically recommended treatment. 958 F. Supp. 2d 1101, 1112–13 (E.D. Cal. 2013). Here, Plaintiff is alleging that officers unreasonably relied on medical professionals where the course of treatment was not sufficient to abate the risk.

### B.      Deputies Sneed, Kendall, Holladay, Gonzalez, and Hatch

Deputies Sneed, Kendall, Holladay, Gonzalez, and Hatch move for summary judgment. Summary judgment on the deliberate indifference claim is granted as to Deputies Gonzalez and Hatch, and denied as to the others. Deputies also assert the defense of qualified immunity. Deputies Sneed, Kendall, and Holladay are denied qualified immunity, while the qualified immunity analysis is unnecessary as to Deputies Gonzalez and Hatch.

### 3.      Deputies Sneed and Kendall

A jury could find that Deputies Sneed and Kendall unreasonably delayed Keaton's necessary medical care, and that the delay caused his death. *See Hutchinson*, 838 F.2d at 394; *Clement*, 298 F.3d at 906; *Hunt*, 865 F.2d at 201. The right against such a delay was clearly established at the time of the violation.

*Hutchinson*, 838 F.2d at 394*; Clement*, 298 F.3d at 906 (failure to effectively treat pepper spray for four hours.) Deputies argue that they did not have specialized medical training, that they did not know how urgent Keaton's condition was on September 5, and that when Dr. Vacharothone said that Keaton should go to the hospital, they did not know that he needed to go right away. Nevertheless, a reasonable jury could find that the urgency of Keaton's condition should have been obvious even without medical training. *See Dau*, 2013 WL 2295463, at *8 (allowing decedent to go to the hospital in a jail van instead of an ambulance)*; Levingston*, 2018 WL 1335410, at *6 (delaying in sending decedent to hospital under paramedics' advice). Altogether, Deputies' unreasonable choices may well have been the moving force behind Keaton's death. *Gordon*, 888 F.3d at 1124-25.

Deputies Sneed and Kendall were the only jail employees working at the jail on the day of Keaton's death. They saw that he was lying on the floor in an unnatural position, not responding verbally, and apparently could not get up from the ground. (ECF No. 83-3 at 21-27.) Keaton's feet were discolored, his breathing was labored, his eyes were rolling back into his head, he was very pale, he was "absolutely lethargic," he looked obviously dehydrated, and his mouth was full of mucous. (*Id*.). MA Powell called Dr. Vacharothone, and told Deputies that Keaton needed to go to the hospital. Nevertheless, Deputies delayed in transporting him to the hospital. (ECF No. 83-9.) Deputy Sneed had never seen anything like it in his career, and was concerned enough about Keaton's condition to look up in-custody deaths on the booking computer. (ECF No. 72-9 at 15.) Deputy Kendall reports that she knew there was something wrong with him and was concerned that he would lose consciousness. (ECF No. 83-3 at 21-27.) Although MA Powell didn't say that Keaton needed to go to the hospital right away, if Deputies interpreted the instructions as non-urgent, this could well be

unreasonable in light of how clear it should have been that Keaton needed care immediately. *Long*, 442 F.3d at 1187.

Instead of taking Keaton to the hospital immediately upon seeing his condition, Deputy Sneed bought Keaton Gatorade with his own money and gave him his own lunch. Both deputies can be seen in body cam footage attempting to help Keaton by pouring water down his throat. (ECF No. 83-14.) Evidence of their subjective concern for Keaton's health is not relevant to the deliberate indifference standard, which is objective. *Castro*, 833 F.3d at 1076*; Gordon*, 888 F.3d at 1124-25. Under the objective deliberate indifference standard, these actions show at most that a reasonable officer in the same situation would have realized that Keaton's medical needs required a more forceful and urgent response.

There is at minimum a question of fact as to whether Deputies Sneed and Kendall unreasonably prioritized security concerns and other tasks above seeking emergency care for Keaton, especially since their choices likely violated jail policy. *Conn*, 591 F.3d at 1101*; Villarreal*, 2018 WL 11606313, at *10; *Clark-Murphy*, 439 F.3d at 290.  After Dr. Vacharothone said that Keaton needed to be taken to the hospital, Deputy Sneed called around for an additional officer to assist with transport and jail staffing while Deputy Kendall accompanied MA Powell on her rounds to distribute medications to other inmates. Then, both Deputies and MA Powell booked in another detainee who had been brought in by the Nevada Highway Patrol. (ECF Nos. 83-9, 83-4 at 50-51.) The Deputies likely were not required by jail policy to call around for backup before sending Keaton to the hospital, and in fact may have been required to call an ambulance because jail policy specifies that medical emergencies take precedence over security concerns. (ECF No. 84-14.) Neither were they required to book the new detainee before sending Keaton to the hospital, as Deputy Kendall noted in her

deposition. (ECF No. 83-3 at 39.) These conditions may well have put Keaton at substantial risk of suffering serious harm, as he passed away during the delay.

Deputies Sneed and Kendall are not entitled to qualified immunity at summary judgment. Keaton had a clearly established right against an unreasonable delay of medical care that causes serious harm. *Hutchinson*, 838 F.2d at 394; *Clement*, 298 F.3d at 906 (denying qualified immunity where officers delayed effective treatment for pepper spray drift for four hours); *see also Hunt*, 865 F.2d at 201 (finding deliberate indifference for delaying dental treatment). Binding precedent establishes that the mere presence of medical professionals is not enough to absolve state actors of liability. *Long*, 442 F.3d at 1187; Conn, 591 F.3d at 1101; *Stewart*, 32 F.4th at 1194; *see also Clark-Murphy*, 439 F.3d at 290. State officials cannot delegate their constitutional responsibilities to medical personnel, and reliance on medical personnel must be reasonable under the circumstances. *Conn*, 591 F.3d at 1101 (denying qualified immunity to officers who should have known of risk of suicide even though the decedent had received multiple medical screenings); *see also Clark-Murphy*, 439 F.3d at 290 (denying qualified immunity to officers on summary judgment where they had opportunities to assess the seriousness of the situation, notwithstanding the involvement of a treating psychologist); *Stewart*, 32 F.4th at 1194 (corrections officials and doctors alike could be constitutionally liable for defective urological care). Taking the facts in the light most favorable to the Plaintiffs, Deputies Sneed and Kendall were presented with obvious signs that Keaton was experiencing unnecessary pain and suffering and was at risk of imminent death and were told that he required hospitalization. Even after seeing Keaton's state, they delayed about an hour before calling an ambulance. This evidence is sufficient to show a violation of a clearly established right.

### 4. Deputy Holladay

A jury could conclude that Deputy Holladay was deliberately indifferent for failing to take reasonable actions to protect Keaton from a substantial risk of serious harm. While Deputy Holladay demonstrated awareness and subjective concern about Keaton's health, his failure to effectively act on his knowledge may amount to a violation of Keaton's rights against denial of medical care. *Hutchinson*, 838 F.2d at 394; *Conn*, 591 F.3d at 1095-98, 1101. Where the detainee's needs are obvious, officers may be deliberately indifferent even if they attribute their failure to respond to security concerns, and even if the decedent was seen by medical personnel. *Conn*, 591 F.3d at 1095-98, 1101 (denying qualified immunity to officers who failed to protect a detainee from an obvious risk of suicide, even though they had spoken to a supervisor, invoked competing security concerns, and the detainee received medical screenings). If a detainee's medical needs are otherwise left unaddressed, passing information about the detainee's medical state up the chain of command may only be evidence that the risk was obvious. *Id.* And even where an officer helps a detainee obtain some medical care, it may not protect them from liability if that medical care is clearly insufficient. *See Ortiz*, 884 F.2d at 1314.

Evidence in the record suggests that Deputy Holladay had clear signs that Keaton was at serious risk, and in fact did recognize that risk. On August 29, Deputy Holladay called the Medical Assistants to attend to Keaton and then took Keaton in a wheelchair to get an IV. Keaton told Deputy Holladay that he wanted to go to the hospital and that he was going to die. (ECF No. 83-19 at 7:10-23.) Deputy Holladay expressed in a memo to Sergeant Silva that although it was clear that Keaton's condition was serious, he felt that Keaton was a security risk and could not be sent to the hospital. (ECF No. 81-10.) Deputy Holladay observed that Keaton's mental state had "degraded" as early as August 29. (*Id.*) The day after, Deputy Holladay sent a memo to Sergeant Silva (ECF No. 68-1) explaining

that "the issue is going to get worse" without a change. *(Id.)* Deputy Holladay saw Keaton again on the night of September 4 and noted that Keaton had only continued to get more lethargic and slower. (ECF No. 83-5 at 13.) He was concerned enough about Keaton's condition that he spoke to Sergeant Silva on the morning of September 5 to suggest that "Schomer's mental status had been deteriorating" and he "might have to go to the Hospital." (ECF No. 81-18.)

Deputy Holladay took some measures to abate Keaton's risk, but a factfinder could find that they were not reasonable. By the morning of September 5, Deputy Holladay knew that Sergeant Silva failed to meaningfully responded to his warnings two times. (ECF No. 68-1.) Though Deputy Holladay was upset (ECF No. 72-7 at 11) by Sergeant Silva's lack of concern for Keaton, there is no evidence in the record that Deputy Holladay took additional steps to address the risk of harm of Keaton, e.g., by speaking to other jail staff or Medallus staff, calling an ambulance himself, or taking other actions to raise Keaton's level of care.

On these facts, a jury could find that a reasonable officer in Deputy Holladay's position would realize that speaking with Sergeant Silva was futile. *See Conn,* 591 F.3d at 1095-98, 1101 (an officer who spoke with a supervisor about a detainee's risk of suicide was still denied summary judgment on deliberate indifference and qualified immunity for his ultimate failure to ensure adequate medical response) But, despite observing Sergeant Silva's lack of concern or action regarding Keaton's worsening status and need for hospitalization, Deputy Holladay did not take further action. Deputy Holladay bears an independent constitutional duty to provide for Keaton's serious medical needs and was empowered by jail policy to take action on his own. (ECF No. 84-8.) His subjective intent is not material under the Ninth Circuit's objective standard for deliberate indifference, except insofar as it shows that he was on

notice of the risks Keaton faced. His failure to take effective action may have caused Keaton's death. *Lemire*, 726 F.3d at 1080-81.

Deputy Holladay cannot be granted qualified immunity on summary judgment. He heard Keaton saying that he needed to go to the hospital and that he was going to die, saw him withdraw consent to an IV and refuse water, and watched him mentally and physically wither as time went on. A jury could find that Deputy Holladay would not have been reasonable to expect that talking to Sergeant Silva about Keaton's health was an adequate response to the problem, considering that Sergeant Silva expressed his noninterest twice. It is beyond dispute that the measures that officers take to abate a detainee's serious medical risk must be reasonable. *Gordon*, 888 F.3d at 1124-25. Where the detainee's needs are obvious, and an officer does not take reasonable efforts to help meet those needs, the Ninth Circuit has denied qualified immunity on summary judgment even though the officer reported to a supervisor, attributed his failure to respond to security concerns in part, and the decedent was seen by medical personnel. *Conn*, 591 F.3d at 1095-98, 1101; *see also Clark-Murphy*, 439 F.3d at 290. Deputy Holladay's failure to take effective action may amount to a violation of the clearly established right against denial of care, which encompasses a right to reasonably effective care. *Stewart*, 32 F.4th at 1194 (affirming a denial of summary judgment where the plaintiff received examinations and medicine, but corrections officers chose "a medically unacceptable course of treatment for the circumstances" that did not adequately address his risk); *Hutchinson*, 838 F.2d at 394; *Ortiz*, 884 F.2d at 1314. It is worth repeating that it was clearly established at the time of the violation that state officials cannot delegate their constitutional responsibilities to medical personnel, and that reliance on medical personnel must be reasonable under the circumstances. *Conn*, 591 F.3d at 1101; *see also Clark-Murphy*, 439 F.3d at 290 (denying qualified immunity to officers on summary judgment where they had

opportunities to assess the seriousness of the situation, notwithstanding the involvement of a treating psychologist); *Stewart*, 32 F.4th at 1194 (corrections officials and doctors alike could be constitutionally liable for defective urological care).

### 5.    Deputies Hatch and Gonzalez

Deputies Hatch and Gonzalez are granted summary judgment because Plaintiff has not shown that all of the *Gordon* factors are met. *Celotex*, 477 U.S. at 322.

Plaintiff's theory is that Deputies Hatch and Gonzalez had regular contact with Keaton throughout both his first and second incarcerations, and knew of his deteriorating mental and physical health, but did not help him seek a higher level of medical care. Deputy Hatch noted that Keaton was bipolar at intake (ECF No. 82-27), wrote a report documenting that Keaton thought someone was trying to kill him telepathically (ECF No. 83-27), and heard Keaton refuse water several times from September 2-3. (ECF No. 83-9.) Deputy Hatch's last known contact with Keaton was on September 3, two days before Keaton's death, when he refused water and threatened to punch Deputy Hatch in the face. (*Id.*) Deputy Gonzalez knew that Keaton had refused water, noticed that he had chapped lips indicative of dehydration, heard him state that he needed an IV and felt sick, and knew that he was schizophrenic and bipolar. (ECF No. 83-6.) It is not clear what her contact with Keaton was like otherwise. Deputy Gonzalez's last recorded contact with Keaton is September 1. (ECF No. 83-9.)

While Deputy Hatch and Deputy Gonzalez may have failed to take appropriate actions, such as calling for an elevated level of psychiatric care, Plaintiff has not produced evidence to show that they each should have appreciated the that the risk incurred was a risk of substantial harm. *Gordon*, 888 F.3d at 1124-25. Plaintiff's expert, former Sheriff Gary Raney, stated that Deputies "should have escalated the delivery of mental health care in the early

part of his stay and medical care in the later part," and that "it does not take a medical professional to see Schomer's mental and medical distress before September 5." (ECF No. 81-25.) Deputies Hatch and Gonzalez were not present on the night of September 4, when Keaton's condition "deteriorat[ed]." (ECF No. 68-47.) While reasonable officers in their positions may have appreciated that Keaton's serious untreated mental health condition, the facts in the record do not support that they reasonably would have known or understood that Keaton faced a risk of significant injury or unnecessary pain, or that they caused his death. Plaintiff has not created a question of fact as to Deputies Hatch and Gonzalez's liability. On the evidence in the record, it appears that their lower level of involvement with Keaton, and their involvement only at earlier stages, distinguishes them from Deputies Holladay, Sneed, and Kendall.

### C.   Elko County

A municipality may be sued for its own actions or omissions. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 693-95 (1978). In establishing that a municipality is liable for a constitutional tort, a plaintiff must show (1) that the municipality had a custom or policy, (2) that the custom or policy caused the injury, and (3) that the custom or policy was adhered to with deliberate indifference to the injured person's constitutional rights. *Castro*, 833 F.3d at 1076. A custom or policy may be "an official policy," "a pervasive practice or custom," "a failure to train, supervise, or discipline," or "a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

A municipality may not be sued under a respondeat superior theory. *Monell*, 436 U.S. at 693–95. Lest municipal liability "collapse[] into respondeat superior," plaintiffs are held to "rigorous" causation standard. *Id.* Regardless, Plaintiff is not required to allege which particular county employee caused the deprivation of rights. Plaintiff may allege that the constitutional deprivation

occurred "not … as a result of actions of the individual officers, but as a result of the collective inaction" of the municipal defendant. *Horton*, 915 F.3d at 604 (quoting *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)).

As with individuals, a plaintiff must show the municipality's deliberate indifference caused the alleged deprivation of rights. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997). Deliberate indifference is measured using an objective standard. *Castro*, 833 F.3d at 1076. "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part). Where a municipality violates its own policies that "explicitly acknowledge that substantial risks of serious harm exist," a plaintiff may demonstrate municipal knowledge of that risk for the purposes of a Fourteenth Amendment failure-to-protect claim. *Castro*, 833 F.3d at 1077 (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.10 (9th Cir. 2002)). A pattern of constitutional violations, or a violation that is a highly predictable consequence of a failure to train under the circumstances can show deliberate indifference. *Long*, 442 F.3d at 1185. A county cannot shift its constitutional responsibility to train its employees to medical and nursing schools. *Id.* at 1187.

Municipalities are not entitled to assert qualified immunity. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1139 (9th Cir. 2018).

### 1.    Failure to train

Reduced to its essence, Plaintiff's allegation is that Defendants failed to act in the face of a medical emergency that required them to do so. In their telling, Keaton's death was the result of a collective failure, suggesting critical errors at the county level. More specifically, Plaintiff alleges that Elko County failed to train jail staff to respond to detainees' mental health and medical needs.

"[F]ailure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Canton*, 489 U.S. at 39; *see also Long*, 442 F.3d at 1185.

A jury could find that Elko County had a custom or policy of failing to train its employees, that the failure to train caused Keaton's injury, and that the systematic failure to train was deliberately indifferent. In other words, the problem was not the policies on the books, but may have been the County's failure to train staff to follow them. Elko County's adoption of regulations that require staff to take a proactive approach to health care provision in some circumstances show that the county actually knew of the risks of passivity. *Castro*, 833 F.3d at 1077. Policies provided that staff must act in health-related emergencies without a supervisor's authorization (ECF No. 84-8), take responsibility for and be trained in medical classification (ECF No. 84-11), isolate and supervise those with medical problems (ECF No. 84-12), transport inmates to the hospital (ECF No. 84-13), check on inmates in medical holding cells every 30 minutes (ECF No. 84-11), and "realize that medical emergencies take precedence over security." (ECF No. 84-14.) In practice, Deputies attended or attempted to attend to Keaton's medical and mental health needs at intake, during his periods of gastrointestinal distress, during his extended refusal to drink water, and during some of his last moments alive. County policies should have governed these interactions and ensured that the care provided by officers met a certain standard.

Despite these policies, there was scant training as to mental health in the jail. Jail employees underwent a mental health training program in the academy, (ECF No. 84-15) and yearly online modules targeted towards mental health concerns that officers might encounter on patrol. (ECF No. 84-16.) Deputy Sneed said in his deposition that the yearly training modules "do not address these concerns in a correction setting." (ECF No. 84-16.) Deputy Holladay appears to

have believed that the training program was insufficient to deal with the demands of the situation. (ECF No. 81-18.) Plaintiff's expert corroborates that the county failed to train custody staff to follow county policy or generally accepted jail practices. (ECF No. 81-25 at 44-45.)

Considering evidence that shows that the county failed to train its employees on its policies regarding detainee health, or how to recognize and adequately respond to health problems, the next question is whether there is a direct causal link between the failure to train and the alleged constitutional deprivation. *Canton,* 489 U.S. at 385. In other words, would the injury have been avoided if employees had been trained under a program that was not deficient in the identified respect? *Id.* at 391. The lack of training must be the "moving force" behind the constitutional violation. *Id.* at 389.

The gravamen of Plaintiff's arguments regarding the jail staff is that they unreasonably failed to recognize that they could and should act to protect Keaton, and the systematic nature of the failure suggests a failure to train or a failure at the policy level. Under county policies, any of the deputies or Sergeant Silva could have sought a higher level of care for Keaton, including mental health treatment or transport to hospital, without first obtaining supervisor approval. (ECF Nos. 84-8; 84-13) (Inmate Services and Programs, ECDC Policy 631; Transportation of Inmates, ECDC Policy 640).  None of them did. All jail staff should have known that medical emergencies took precedence over security, and yet both Deputies Sneed and Holladay failed to obtain more medical care and appeared to resolve conflicts between security and medical needs in favor of security. (ECF No. 84-14) (Hospital Duty, ECDC Policy 663).

Testimony also supports that the county's failure to train its employees may have been the moving force behind Keaton's death. Deputy Holladay expressed in a draft memo that he thought that jail staff had failed to ensure Keaton's health and safety in part because of inadequate training and a lack of

33

guidance. (ECF No. 81-18.) Deputies Sneed and Kendall's delay in calling an ambulance on the day of Keaton's death also reflects a lack of training on policy and generally accepted practices. (ECF No. 82-25.) Plaintiff's expert, former Sheriff Raney, opined that the County "failed to sufficiently train its staff on generally accepted jail practices for providing reasonable care for Keaton Schomer, likely contributing to his death… Had generally accepted jail training and practices been followed, Schomer would have received medical care much sooner and may be alive today." (ECF No. 82-25.) *See Long,* 442 F.3d at 1188 (plaintiff's claim survived summary judgment where the plaintiff's experts opined that the municipality had failed to train staff in patient care, and that the failure to train caused a death).

A jury could find that this failure to train reflects deliberate indifference towards the constitutional rights of detainees. *Id.* at 392. Deliberate indifference turns on whether the county had actual or constructive notice that the relevant actions could cause the harm. A jury may infer notice "when a municipal actor disregarded a known or obvious consequence of his actions." *Bd. of Cnty. Comm'rs*, 520 U.S. at 410. Here, the consequences of a failure to train were both known and obvious. The county's creation of policies to address detainee health shows that policymakers knew that employees needed to meet the challenge of handling detainee health needs, including in emergency situations. *See Castro*, 833 F.3d at 1077 (where a municipality violates its own policies that "explicitly acknowledge that substantial risks of serious harm exist," a plaintiff may demonstrate municipal knowledge of that risk for the purposes of a Fourteenth Amendment failure-to-protect claim.) A jury could find that had employees been trained, Deputy Holladay's actions might have been guided by the policy authorizing staff to take initiative in emergencies without a supervisor's authorization. (ECF No. 84-8) (Inmate Services and Programs, ECDC Policy 631). Deputy Sneed and Kendall's actions could have been informed by policies

directing staff to prioritize medical emergencies over security concerns, transport detainees to the hospital, and to take other actions related to detainee health. (ECF Nos. 84-13; 84-14) (Hospital Duty, ECDC Policy 663; Transportation of Inmates, ECDC Policy 640). Policymakers also would have had constructive notice that jail staff members needed training because it was obvious. When policymakers know that municipal employees will encounter those with health needs, "yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result." *See Gibson*, 290 F.3d at 1196. "It is widely accepted that jail inmates have a more significant proportion of medical and mental health needs than the general population. Substance abuse and mental illness are two of the most significant and frequent challenges for jail staff." (ECF No. 82-25.)

### 2. Custom or practice of passivity

Plaintiff's second allegation is that Defendants have "a pervasive practice or custom" of inaction, and that the collective inaction of officers as a whole caused the constitutional deprivation. *Horton*, 915 F.3d at 602–03.

A reasonable jury could find that the County had a culture of passivity with regard to medical care. (ECF No. 81-25) ("It is clear that the ECSO staff were aware of the potential harm of their inaction, but nonetheless, they continued to do nothing to provide Schomer with proper medical care.") Over two weeks, multiple Elko County employees observed Keaton refusing water and medicine, asking to be sent to the hospital, claiming he was going to die, and showing signs of escalating dehydration and ever more serious mental illness. (ECF No. 83-9.) Evidence in the record shows that Keaton consented to an IV one time, although he withdrew his consent partway through the treatment. Other than that, there is nothing in the record to show that any person tried to obtain Keaton a higher level of care until he was approximately 20 minutes from death. (ECF No. 84-6.) County employees may have adhered to a "wait and see" approach, even as

Keaton's condition got worse and the necessity of action became ever more clear. *See Stewart*, 32 F.4th at 1194.

This practice or custom of inaction was deliberately indifferent. Because of county employees' close involvement with detainee healthcare provision, it may have been obvious that jail staff from the Sheriff on downwards needed to take an active role in addressing healthcare needs. (ECF No. 82-25.) County policies show municipal knowledge of the risk of serious harm where they explicitly acknowledge the importance of taking initiative, *see Castro*, 833 F.3d at 1077, authorizing release of sick detainees to the hospital and providing procedures for transportation, authorizing staff to act without a supervisor and directing them to prioritize medical emergencies over security. (ECF Nos 84-12; 84-13; 84-8; 84-14) (Inmate Booking and Release, ECDC Policy 623; Transportation of Inmates, ECDC Policy 640; Inmate Services and Programs, ECDC Policy 631; Hospital Duty, ECDC Policy 663). Yet Elko County employees systematically responded to Keaton's medical condition passively, declining to transport him to the hospital, declining to take action without a supervisor, and declining to act to protect his health over facility security. A jury could find that this failure to act was deliberately indifferent, and that county employees' collective inaction may have caused Keaton's in-custody death.

### D.    Sheriff Narvaiza and Undersheriff Aimes

Supervisory employees of the municipality may be held responsible for their individual conduct. *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011). Supervisors may be liable for their own culpable (1) action or inaction in the training, supervision, or control of subordinates; (2) acquiescence in the constitutional deprivation of which a complaint is made; or (3) conduct that shows a reckless or callous indifference to the rights of others. *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022); *Starr*, 652 F.3d at 1206–07. The act or lack of action must have actually caused a deprivation of constitutional rights,

and must have been undertaken with deliberate indifference to a known or obvious consequence. *Hyde*, 23 F.4th at 874. It is undisputed here that Sheriff Narvaiza and Undersheriff Aimes had no knowledge of Keaton specifically. Plaintiff argues that they failed to ensure that staff were trained, that they acquiesced to Sergeant Silva's culpable conduct, and that they acquiesced to general inaction on the part of their subordinates.

The evidence in the record does not show that the Sheriff and Undersheriff's acts were causally connected to the omissions that Plaintiff has identified or to Keaton's death. Plaintiff has not shown that the Sheriff and Undersheriff caused the lack of training, other than alleging generally that Sheriff Narvaiza was statutorily required to maintain custody and care of the prisoners in the jail. NRS 248.050. No specific act or moment of inaction has been identified that specifically ties the Sheriff and the Undersheriff to the failure to train. Plaintiff also alleges that Undersheriff Aimes acquiesced to Sergeant Silva's unconstitutional conduct in failing to ensure that his staff to conducted regular cell checks, and that the Sheriff is required to take responsibility for the conduct of the keeper appointed for the jail. NRS 248.050. However, it is not clear that more frequent cell checks could have saved Keaton's life, particularly when multiple officers and Medallus Defendants witnessed his ultimate decompensation and still failed to prevent his death. Finally, it is not clear that the Sheriff and Undersheriff acquiesced to inaction on the part of jail staff. Sheriff Narvaiza signed a policy giving health providers "sole judgment" over medical, dental, and mental health treatment, and allegedly was derelict in his duty to communicate with Medallus about detainee care. (ECF No. 84-9 at 3) (Prisoner Medical Care and Billing, ECDC Policy 637). But the record does not show a causal link between the Sheriff's actions and jail staff's passivity in the face of Keaton's medical crisis. (*Id.*) If the Sheriff was sometimes passive, is not clear what he may have done to communicate that passivity to front-line staff.

37

Since the Sheriff and the Undersheriff are granted summary judgment on deliberate indifference, there is no need to analyze whether they are entitled to qualified immunity. *Saucier,* 533 U.S. at 201

### E.     Medallus Defendants

Medical assistants Bailey Powell, Geoffrey Fisher, Mercedes Cochrell, and Letiscya Chacon move for summary judgment on deliberate indifference. Their primary argument is that they were not deliberately indifferent because they reported Keaton's condition to licensed medical providers, followed their instructions to monitor Keaton, and encouraged him to drink and consent to IV hydration. (ECF No. 70.) There is a genuine dispute of material fact as to MA Powell and MA Chacon's deliberate indifference. The Court grants summary judgment to MA Cochrell and MA Fisher.

"[A]ccess to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz,* 884 F.2d at 1314; *see Stewart,* 32 F.4th at 1194 (holding that prison medical staff "violate the constitution when they choose a medically unacceptable course of treatment for the circumstances.") Frontline medical staff cannot always shift their responsibility for providing competent care onto a supervisor. Medical staff must reasonably rely on a doctor's instructions that are suited to a patient's current condition. In *Russell,* the Ninth Circuit affirmed a district court's denial of summary judgment for two nurses where their patient displayed the "classic" and "obviously severe" symptoms of a heart attack, but in reliance on a doctor's instructions issued hours earlier, they only gave him Motrin. 31 F.4th at 742. In the same case, the Ninth Circuit granted summary judgment on qualified immunity to a nurse who saw the same patient, called a doctor, and followed the doctor's new instructions to give him Motrin and a mental health screening. *Id.* The district court in *Dau* denied summary judgment to a nurse who was familiar with the decedent's consistently poor state of health but did not recommend that she see a doctor

until a few days before her death; and who saw the decedent lying in a cell unresponsive on the day that she died but made arrangements for a non-emergency transport to the hospital only. *Dau,* 2013 WL 2295463 at *7.

Medical Assistants do not, and likely cannot, assert the defense of qualified immunity. *Ace Beverage Co. v. Lockheed Info. Mgmt. Servs.*, 144 F.3d 1218, 1219 (9th Cir. 1998).

### 1.    MA Chacon

A reasonable jury could find that MA Chacon was in a position to abate the high degree of risk that Keaton faced, but did not, contributing to Keaton's death. *Gordon,* 888 F.3d at 1124-25. MA Chacon may have unconstitutionally delayed or denied Keaton's medical treatment. *Hutchinson,* 838 F.2d at 394; *Stewart*, 32 F.4th at 1194.

First, MA Chacon knew that Keaton needed anti-psychotic medications, undertook to obtain them, and then apparently failed to obtain them. Given that Keaton had stopped drinking water because he was having delusions that the water was poisoned (ECF No. 82-3), medication could have improved his possibility of survival. *Hutchinson,* 838 F.2d at 394  (unconstitutional to deny necessary medical care); *Clark-Murphy,* 439 F.3d at 290 (finding a clearly established constitutional right to psychiatric care); *see Montano,* 842 F.3d at 878 (leaving a detainee alone for multiple days to "heal himself" amounts to an unconstitutional punishment).

Second, MA Chacon saw Keaton's condition worsening around noon on September 5, and noted that his eyes were rolled back and he was more lethargic than before. (ECF No. 83-9.) When Deputies came to see him a few minutes later, they found him lying on the floor, apparently unable to get up, and mostly unresponsive, with labored breathing and a mouth full of mucous. (ECF No. 83-3.) Deputy Kendall worried that Keaton was going to lose consciousness before their eyes. (*Id.*) In fact, Keaton was about two hours from death at the time.

Despite the severity of Keaton's symptoms, MA Chacon decided that Keaton could wait for treatment until a nurse's scheduled rounds at 3:00 p.m. (ECF No. 83-9.) Keaton passed away before the nurse's rounds began. (ECF No. 84-6.) *Stewart*, 32 F.4th at 1194 (a "wait and see" approach may amount to the unconstitutional delay and denial of treatment); *see Estelle*, 429 U.S. at 103 (detainees' rights to medical care protect against the unnecessary and wanton infliction of pain and suffering, and in the worst cases, death).

MAs argue that they cannot be liable for deliberate indifference because they were acting on orders from medical providers to provide Keaton with fluids and offer him IV hydration. But reliance on the opinion of someone with more training does not always exempt medical providers from constitutional liability. *See Russell*, 31 F.4th at 744, 745 (nurses denied summary judgment where they unreasonably relied on stale orders from a doctor). When MA Chacon saw Keaton's condition worsening on September 5, she had access to facts that should have led her to conclude that he was at a substantial risk of serious harm, and that previous orders to continue reasoning with Keaton to get him to drink water were no longer applicable. (ECF No. 82-3 at 26) (Nurse Kathryn Wild expert report for Plaintiffs) (MAs' failures to refer him to a higher level of care when he they knew he was dehydrated, asking to go to the hospital, and not having a will to thrive was "well below the standard of care.") Yet she did not call a provider, even though a provider was supposed to be available around the clock to guide medical assistants. (ECF No. 68-3 at 16.) Instead, she continued to wait, even though she could reasonably have inferred that Keaton's health had deteriorated and the previous lack of urgency was no longer appropriate, if it ever was. *Russell*, 31 F.4th at 744, 745; *Dau*, 2013 WL 2295463, at *7 (denying summary judgment on deliberate indifference to a nurse who caused a potentially deadly delay in care);

40

### 2.   MA Powell

There is a dispute of material fact as to whether MA Powell was deliberately indifferent in causing fatal delays or denials of effective care for Keaton throughout his incarceration, and particularly on the day he died. *Gordon*, 888 F.3d at 1124-25; *Hutchinson*, 838 F.2d at 394. Medical professionals may "violate the constitution when they choose a medically unacceptable course of treatment for the circumstances." *Stewart*, 32 F.4th at 1194. There were several opportunities when MA Powell may have failed to take reasonable available measures to abate a substantial risk of serious harm, and  Keaton's injuries.

First, MA Powell noted at booking that Keaton was hearing things and seeing colors. (ECF No. 82-16.) Per jail policy, Keaton should have been transported to the hospital, but he was not. (*Id.*) Neither is there anything in the record to show that MA Powell created a treatment plan for Keaton or reported his hallucinations to a licensed provider upon his arrival at the jail. (ECF No. 82-3 at 27) (Nurse Kathryn Wild's expert report for Plaintiffs) (MA Powell's failure to report Keaton's mental symptoms or create a treatment plan at booking fell "well below the standard of care.") A jury could find that MA Powell could have recognized and asserted that Keaton was not in a fit state to be in jail at all, but she did not. *Clark-Murphy*, 439 F.3d at 290 (finding a clearly established right to psychiatric care); *Stewart*, 32 F.4th at 1194.

Second, during Keaton's incarceration, MA Powell became familiar with his condition, and yet did not seek to escalate his treatment. *See. Dau*, 2013 WL 2295463, at *7 (denying summary judgment on deliberate indifference to a nurse who was familiar with the decedent's condition but delayed emergency treatment). She "had access to facts" that showed that Keaton was at serious risk: namely, that he had serious mental illnesses, was not drinking water, and was asking to go to the hospital. *Russell*, 31 F.4th at 742. It took MA Powell over ten minutes to insert an IV in Keaton's arm on August 31, which a jury could

41

find suggests dehydration. (ECF No. 83-19.) After that, she saw him refuse the IV and heard him say he was going to die and needed hospitalization. (*Id.*) Even more striking, on September 4 MA Powell asked Keaton to sign an Against Medical Advice (AMA) form stating that he was declining treatment for his "serious medical condition" and accepting responsibility for "its potentially dangerous complications." (ECF No. 82-19.) Keaton refused to sign. (*Id.*) The fact that MA Powell presented Keaton with an AMA form suggests that she both should have known and likely actually knew that Dr. Vacharothone's standing orders to push fluids on Keaton were insufficient, but there is nothing in the record to show that she sought new instructions. (ECF No. 82-3 at 26) (Nurse Kathryn Wild's expert report for Plaintiffs) (MAs' failures to refer him to a higher level of care when he they knew he was dehydrated, asking to go to the hospital, and lacking a will to thrive were "well below the standard of care.") A jury could find that in letting out-of-date doctor's orders continue to dictate the response to Keaton's ongoing medical condition, MA Powell's actions were careless enough to amount to deliberate indifference. *Id.*

Third, there is a dispute of material fact as to whether MA Powell unreasonably delayed in obtaining Keaton treatment on the day of his death. Medical personnel may be deliberately indifferent where they fail to treat an emergency situation as an emergency, leading to a delay that causes the patient's death. *Dau*, 2013 WL 2295463, at *7; *Hutchinson*, 838 F.2d at 394; *see Stewart*, 32 F.4th at 1194. Around 12:05 p.m. on September 5, MA Powell and MA Chacon saw Keaton's worsening condition and decided to have him seen by a medical provider at 3:00 p.m. (ECF No. 83-9.) At 1:20 p.m., MA Powell called Dr. Vacharothone, who told her that Keaton needed to be sent to the hospital. (*Id.*) It is not clear what level of urgency Dr. Vacharothone conveyed, but when MA Powell told deputies that Keaton should go to the hospital, she did not say he needed to go immediately. Rather, she expressed concern about the effect that

taking Keaton to the hospital would have on the jail's staffing levels. (ECF No. 83-14.)  MA Powell then left Keaton alone to go dispense medications to other inmates, and then to assist deputies in booking a new arrival to the jail. (ECF Nos. 83-4 at 38; 72-1 at 21.) Keaton passed away alone, still not having been seen by any licensed medical provider. (ECF No. 82-3 at 31.) A jury could reasonably find that because she delayed emergency care in Keaton's last hours, MA Powell's deliberate indifference caused his death. *Dau*, 2013 WL 2295463, at *8.

### 3.    MA Fisher and MA Cochrell

There is not enough in the record to show that MA Cochrell and MA Fisher may have been deliberately indifferent. Even though all justifiable inferences are drawn in Plaintiff's favor at this stage, he must produce make a showing sufficient to establish the elements essential to their case, and on which they will bear the burden at trial. of proof. *Celotex*, 477 U.S. at 322. They have not done so with respect to the deliberate indifference claim against these two Defendants.

Although MA Fisher and MA Cochrell noted that Keaton was dehydrated due to his refusal to drink water, there are not enough facts in the record to show that at the time when they last saw him, a reasonable person in their position would realize the risk of serious injury and done something else to abate it. *Gordon,* 888 F.3d at 1124. MA Fisher noted that Keaton was not eating or drinking, appeared dehydrated, and "does not appear to have a desire to survive and thrive." MA Cochrell also noted that Keaton refused to eat or drink because he "thought there was poison in the food and water" (ECF No. 82-29), and noted that he was dehydrated and asked to be sent to the hospital. The last medical note appearing in the record written by MA Cochrell is dated August 31, and the last one written by MA Fisher is dated August 26, both well before the night of September 4 to September 5, when Keaton's condition seems to have taken a

43

turn for the worse. (ECF No. 83-9.) Drawing every factual inference in Plaintiff's favor, there isn't enough to show that MA Cochrell and MA Fisher's observations should have put them on notice that Keaton faced a risk of serious harm if they didn't take it upon themselves to act.

## IV.    LOSS OF FAMILIAL ASSOCIATION AND QUALIFIED IMMUNITY

In their complaint, Plaintiffs seek relief under Section 1983 for a violation of their Fourteenth Amendment substantive due process right to familial association. Parents have a constitutionally protected interest in the companionship of their children, including their adult children. *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1132–33 (9th Cir. 2017); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987). No precedent has expanded the doctrine to give siblings a cause of action. As Plaintiffs conceded at the hearing, Dwayne Schomer can bring a claim for loss of familial association as Keaton's father, but Defendants receive judgment as a matter of law as Braylen Schomer's claim.

Plaintiff can bring a claim for loss of familial association over "[o]fficial conduct that 'shocks the conscience' in depriving [him] of that interest." *Jones*, 873 F.3d at 1132–33 (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). In situations where an officer should have time to consider their actions, their "deliberate indifference may suffice to shock the conscience." *Wilkinson*, 610 F.3d at 554. (internal citations omitted). In the Ninth Circuit, a claim of loss of familial association can be stated "without further alleging that the official was trying to break up their family." *Farmer v. Las Vegas Metro. Police Dep't*, 423 F. Supp. 3d 1008, 1017 (D. Nev. 2019) (quoting *Smith*, 818 F.2d at 1420 n. 12). In other words, there is no requirement that plaintiffs show that defendants intended to harm them specifically.

Because deliberate indifference may suffice to shock the conscience, *Wilkinson*, 610 F.3d at 554, Mr. Schomer's claims of loss of familial association

parallel the deliberate indifference claims, and at this stage are adequately supported with the same evidence and against the same Defendants. Conversely, the same Defendants who are granted summary judgment on deliberate indifference are granted summary judgment on loss of familial association. Because there is a question of material fact as to whether Sergeant Silva, Deputy Sneed, Deputy Kendall, Deputy Holladay, and Elko County were deliberately indifferent towards Keaton, claims of loss of familial association against those defendants survive as well. The Ninth Circuit has held that deliberate indifference may suffice to shock the conscience. *Wilkinson*, 610 F.3d at 554. For the same reasons that a jury might find that officers were deliberately indifferent under clearly established law, a jury could reasonably find that officers' conduct clearly shocked the conscience and violated Dwayne Schomer's interest in the companionship of his adult child. Defendants therefore are not entitled to qualified immunity on the claim of loss of familial association.

## V.    STATE CLAIMS

Dwayne Schomer, individually and as the administrator of Keaton's estate, and Braylen Schomer assert negligence, gross negligence, negligent hiring, training, and supervision, and wrongful death against various sets of Defendants. Dwayne Schomer as an individual and Braylen Schomer, but not the estate, also assert a claim of intentional infliction of emotional distress against all Defendants.

### A.    Discretionary-Act Immunity

Deputy Defendants, Elko County Defendants, and Sergeant Silva raise discretionary-act immunity as a defense to Plaintiffs' state claims. The Sheriff, the Undersheriff, and Deputies Hatch and Gonzalez are entitled to assert discretionary-act immunity at this stage because they are granted summary judgment on the constitutional claims. The rest cannot.

State employees, agencies, and political subdivisions are entitled to discretionary-act immunity if their decisions "(1) involved an element of individual judgment or choice and (2) [were] based on considerations of social, economic, or political policy." *Martinez v. Maruszczack,* 168 P.3d 720, 729 (Nev. 2008); NRS 41.032; *see Amistad Christiana Church v. Life is Beautiful, LLC*, 692 F. App'x 922, 924 (9th Cir. 2017) (cities may be entitled to discretionary-act immunity); *Travelers Hotel, Ltd. v. City of Reno,* 741 P.2d 1353, 1355 n.4 (Nev. 1987) (same). Discretionary-act immunity mirrors the Federal Tort Claims Act's discretionary function exception, which "prevents judicial 'second-guessing' of legislative and administrative decisions… through the medium of an action in tort." *Martinez,* 168 P.3d at 729 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). When determining if an officer's discretionary acts are "based on considerations of social, economic, or political policy," courts inquire not into the official's state of mind, but rather into the nature of the official acts and whether it is susceptible to policy analysis.

There are two limitations on discretionary-act immunity. First, discretionary-act immunity does not apply where the officer or state entity acts in bad faith. *Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991). Second, discretionary-act immunity will not protect allegedly tortious acts that were also taken in violation of the Constitution. *See, e.g. Koiro v. Las Vegas Metro. Police Dep't,* 69 F. Supp. 3d 1061, 1074 (D. Nev. 2014), *aff'd,* 671 F. App'x 671 (9th Cir. 2016) (officer not entitled to discretionary-act immunity on negligence and battery claims because his alleged actions violated the Constitution).

Where Defendants' conduct was unconstitutional, it is outside of the scope of their discretion and not protected by discretionary-function immunity. Since Sergeant Silva, Deputy Sneed, Deputy Kendall, Deputy Holladay, and Elko County are denied summary judgment on Plaintiffs' constitutional claims, they

46

must also be denied a discretionary-act immunity defense to the state tort claims against them.

Discretionary-act immunity shields the Sheriff, the Undersheriff, and Deputies Hatch and Gonzalez from liability. Since they are granted summary judgment on the constitutional claims, and no other factor appears to prevent them from asserting discretionary-act immunity, they are entitled to the benefits of this defense.

### B.    Negligence and Negligence Per Se

Plaintiffs assert ordinary negligence against all Defendants, and additionally assert a theory of negligence per se against all individual state employees. All Defendants except for Medallus Medical and Dr. Vacharothone move for summary judgment on negligence. MA Fisher is granted summary judgment on negligence because Plaintiffs have not made an evidentiary showing that he could be liable. The Sheriff, Undersheriff, and Deputies Hatch and Gonzalez benefit from discretionary-act immunity. The negligence claim survives summary judgment against all other defendants.

### 1.    Negligence

Under Nevada law, a defendant is liable for negligence if: 1) the defendant owed a duty of care to the plaintiff; 2) the defendant breached that duty; 3) the breach was the legal cause of the plaintiff's injuries; and 4) the plaintiff suffered damages. *DeBoer v. Sr. Bridges of Sparks Fam. Hosp.*, 282 P.3d 727, 732 (Nev. 2012).

"The Nevada Supreme Court has stated that as a general rule, 'state officials have a duty to exercise ordinary care in performing their duties.'" *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1065 (Nev. 2007) (internal quotations altered). "Because the question of whether reasonable care was exercised almost always involves factual inquiries, it is a matter that must generally be decided by a jury." *Id*. Under certain circumstances, prison officials may also owe

47

detainees a special duty of protection. *See id; Hill v. Las Vegas Metro. Police Dep't*, 197 F. Supp. 3d 1226, 1235–36 (D. Nev. 2016), *aff'd*, 705 F.App'x 616 (9th Cir. 2017).

### a.      Elko County, County Sheriff, and Employees

As explained *supra*, there is a material question of fact as to whether Sergeant Silva, Elko County, and Deputies Sneed, Kendall, and Holladay were objectively deliberately indifferent to a risk of substantial harm. Objective deliberate indifference is "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1124-25. If these defendants may have been deliberately indifferent, then their conduct may have been negligent as well. In light of the possible constitutional violation, these Defendants are not entitled to discretionary-act immunity at summary judgment. The negligence claim against them can proceed to trial.

The Sheriff, Undersheriff, and Deputies Hatch and Gonzalez are granted summary judgment on negligence due to discretionary-act immunity.

### b.      Medical Assistants

Among the Medallus Defendants, only Medical Assistants move for summary judgment on negligence.[1] Medical Assistants who are denied summary judgment on deliberate indifference must also be denied summary judgment on negligence, because objective deliberate indifference is more careless than negligence. *Id.* MA Chacon and MA Powell are therefore denied summary judgment on negligence.

---

[1] It is not completely clear if the other Medallus defendants are moving for summary judgment on negligence. Medallus Defendants suggested in their motion on page 3 that all of them were moving for summary judgment on negligence. (ECF No. 70 at 3.) However, in that motion's fuller discussion on negligence, only Medical Assistants are mentioned. (*Id.* at 14-15.) Medallus Defendants state multiple times that this case sounds in negligence rather than IIED. (ECF Nos. 70 at 18; 90 at 2, 18.) The Court infers that Medallus Defendants' statements on page 3 of their motion were either not meant to suggest that Dr. Vacharothone and Medallus Medical were also moving for summary judgment on negligence, or they were a typographical error. (ECF No. 70 at 3.)

MA Fisher and MA Cochrell's motion for summary judgment on negligence must be considered on its merits. It cannot be denied on the basis of a fact question on their deliberate indifference since there is none, and it cannot be granted on the basis of discretionary-act immunity since they are contractors.

MA Fisher last saw Keaton on August 26 and was not working on the day of his death. Between August 23 and August 26, MA Fisher wrote down that Keaton refused medicine, logged his temperature, and noted that he did "not appear to have a desire to survive and thrive." (ECF No. 83-9.) Having last seen Keaton about ten days before his condition likely became critical, MA Fisher's lack of action does not appear to have breached the ordinary duty of care. While he knew that Keaton lacked the desire to survive and thrive, it is not clear that he knew that this condition would persist, or that he needed to intervene and refer him to a higher level of care right away. Plaintiffs have not shown that there is a dispute of material fact as to MA Fisher's negligence here. *Celotex*, 477 U.S. at 322.

MA Cochrell saw Keaton over a period of approximately eight days, ending on August 31, about five days before his death. (ECF No. 83-9.) She noted that Keaton refused to eat or drink because he "thought there was poison in the food and water" (ECF No. 82-29), and noted that he was dehydrated and asked to be sent to the hospital. On the same day that MA Cochrell last saw Keaton, Deputy Holladay took him to get an IV, and expressed concern to Sergeant Silva about Keaton's deteriorating mental and physical health. (ECF No 68-1.) MA Cochrell was in a better position to understand and respond to the urgency of Keaton's medical condition than MA Fisher. She knew that he was asking to be taken to the hospital, and she was working at the jail when his mental and physical health had deteriorated to the point where Deputy Holladay was able to make the inference that he needed or would soon need a higher level of care. Nevertheless, MA Cochrell also did not refer Keaton to a higher level of care. Plaintiffs have

created a dispute of material fact as to whether MA Cochrell's behavior fell below the standard of ordinary care.

Medical Assistants generally argue that Plaintiffs' negligence claim fails on causation. They argue that Plaintiffs have not shown causation because where claims of injuries involve "obscure medical factors," expert testimony on causation is required, and Plaintiffs' medical expert has not causally linked Medical Assistants' conduct to Keaton's death. *Schudel v. GE,* 35 Fed. Appx. 481, 484 (9th Cir. 2002) (citing *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 477 (Wash. Ct. App. 1995)). But here, the medical factors are not "obscure" or "beyond the understand of a lay person," making this case distinguishable from those cited by the Medical Assistants. *Schudel,* 35 Fed. Appx. at 484; *Bruns*, 890 P.2d at 477. Keaton died of complications of dehydration. (ECF No. 84-7.) A scientific understanding of how dehydration leads to death is not necessary: rather, the facts show that he was dehydrated because he did not drink water. Considering the record as a whole, there is sufficient evidence to create a question of fact for the jury that MAs caused Keaton's death through their inaction on September 5, as well as at other moments. Plaintiffs are not required to support their case with stronger evidence than that.

As a consequence, summary judgment on negligence is granted as to MA Fisher, but denied as to MAs Cochrell, Chacon, and Powell.

### 2.  Negligence Per Se

Plaintiffs also bring a claim of negligence per se against Deputy Defendants, Sergeant Silva, and the Elko County Defendants. While Plaintiffs style negligence per se as a separate cause of action from negligence, it is a method of establishing the duty and breach elements of a negligence claim. *Munda v. Summerlin Life & Health Ins. Co.*, 267 P.3d 771, 774 n.3 (Nev. 2011); *Cervantes v. Health Plan of Nevada,* 263 P.3d 261, 264 n.4 (Nev. 2011). Negligence and negligence per se will therefore be considered together.

"A civil statute's violation establishes the duty and breach elements of negligence when the injured party is in the class of persons whom the statute is intended to protect and the injury is of the type against which the statute is intended to protect." *Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1283 (Nev. 2009). The statute that Plaintiffs bring to supply the duty and breach elements of negligence here is NRS 41.1395, which creates a cause of action against a defendant who causes the death of a "vulnerable person."

The negligence per se analysis does not change the outcome of state defendants' motions for summary judgment on negligence. Discretionary-act immunity still protects Deputies Hatch and Gonzalez, the Sheriff, and the Undersheriff. Discretionary-act immunity does not apply to Sergeant Silva and Deputies Sneed, Kendall, and Holladay, so the claim against them proceeds. Elko County claims that it cannot be sued under a theory of negligence per se because a state actor is not a "person" as the term is used in NRS 41.1395. Plaintiffs concede that the County cannot be held liable under their theory of negligence per se. (ECF No. 27.) Nevertheless, because Plaintiffs' ordinary negligence claim against Elko County proceeds, and because negligence per se is not a separate cause of action from negligence, Elko County is not entitled to summary judgment.

### C.    Gross Negligence

Plaintiffs allege gross negligence against Deputy Defendants, Sergeant Silva, and County Defendants.[2]  Summary judgment is granted on this claim as to all the Defendants who can avail themselves of discretionary-act immunity and denied as to the rest.

Ordinary negligence and gross negligence "differ in the degree of inattention." *Batt v. State*, 901 P.2d 664, 667 n.5 (Nev. 1995) (quoting *Hart v.*

---

[2] Plaintiffs bring a claim of professional negligence against Medallus defendants. Medallus defendants have not moved for summary judgment on this claim, so it will not be addressed in this order.

*Kline*, 116 P.2d 672 (Nev. 1941)). Gross negligence is substantially less prudent than ordinary negligence, *id.,* but a lower standard than deliberate indifference to serious medical needs. *Gill v. Halki*, No. 3:23-CV-00360-MMD-CSD, 2025 WL 3022182, at *2 (D. Nev. Oct. 28, 2025); *Smith v. Centurion Med.*, No. 223CV01030RFBBNW, 2024 WL 1345280, at *3 (D. Nev. Mar. 30, 2024); *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990); *see L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996).  "A party is 'grossly or wantonly negligent' if he acts or fails to act when he knows or has reason to know facts which could lead a reasonable person to realize that his conduct not only creates unreasonable risk of bodily harm to others but also involves high probability that substantial harm will result." *Batt,* 901 P.2d at 667 n.5 (quoting *Walls v. Arizona Dept. of Public Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991)). Generally, the degree of a party's inattention is a question of fact to be decided by a jury. *Fargo v. City of San Juan Bautista*, 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence or recklessness, the question is one of fact to be decided by a jury.")

The Sheriff, Undersheriff, and Elko County, with Sergeant Silva and Deputy Defendants joining, claim that gross negligence is merely negligence with punitive damages, and since NRS 41.035 prohibits tort awards of punitive damages against state actors, Plaintiffs' gross negligence claim cannot proceed against them. (ECF No. 71.) As explained above, there are legally material differences in the gross negligence and negligence standard, and both claims can properly be brought against Defendants at this stage without regard to potential recovery. *See, e.g. Martin v. Collier*, No. 2:11-CV-0320-LRH-GWF, 2011 WL 1628028, at *2 (D. Nev. Apr. 28, 2011). Nevertheless, the Sheriff, Undersheriff, and Deputies Hatch and Gonzalez are entitled to summary judgment on the basis of discretionary-act immunity.

Plaintiffs' gross negligence claim against the County, Sergeant Silva, and Deputies Sneed, Kendall, and Holladay proceeds.

### D.    Negligent Hiring/Training/Supervision

Plaintiffs' negligent hiring, training, and supervision claim is brought against County Defendants and Medallus Medical only. The Sheriff and Undersheriff are granted summary judgment on this claim on the basis of discretionary-act immunity, while the claim proceeds against Elko County and Medallus Medical.

A claim of negligent hiring, training, or supervision is "based upon the premise that an employer should be liable when it places an employee, who it knows or should have known behaves wrongfully, in a position in which the employee can harm someone else." *Okeke v. Biomat USA,* 927 F.Supp 2d 1021, 1028 (D. Nev. 2013) (citing *Daisley v. Riggs Bank, N.A.,* 372 F.Supp.2d 61, 79 (D.D.C. 2005)). The Sheriff and Undersheriff are entitled to discretionary-act immunity and are granted summary judgment on this claim. As explained above, Elko County is not entitled to discretionary-act immunity on summary judgment. Since discretionary-act immunity is the only basis for summary judgment that Elko County asserts, the claim against it proceeds. Medallus Medical does not move for summary judgment on this claim, and the claim against it proceeds as well.

### E.    Wrongful Death

Plaintiffs bring a wrongful death claim against Sergeant Silva, Deputy Defendants, and County Defendants. The claim survives summary judgment except against the Defendants who are entitled to the defense of discretionary-act immunity.

When "the wrongful act or neglect of another" causes a death, the decedent's heirs and personal representatives may each maintain an action against the person who caused the death. NRS 41.085. Negligence and wrongful death

claims may overlap when they are both based in the negligent conduct of the defendant, but are pleaded separately and may lead to different recovery. *See, e.g. Est. of Faranesh v. Eighth Jud. Dist. ex rel. Clark*, 134 Nev. 935, 935 (Nev. Ct. App. 2018). A plaintiff alleging wrongful death is not required to plead specific intent. *See id.*; *Perez v. Las Vegas Med. Ctr.*, 805 P.2d 589, 593 (1991). Defendants move for summary judgment on the basis of NRS 41.0334, which exempts a state actor from liability for certain actions. (ECF No. 71 at 25.) However, NRS 41.0334 only applies if the decedent was engaged in a specified criminal act at the time that the wrongful death was caused. NRS 41.0334(1). Here, there has been no allegation that Keaton was engaged in a criminal act at the time of his death. The wrongful death claim proceeds against Elko County, Sergeant Silva, and Deputies Sneed, Kendall, and Holladay. Discretionary-act immunity protects Deputies Hatch and Gonzalez, the Sheriff, and the Undersheriff.

### F.    IIED

Plaintiffs bring a claim of intentional infliction of emotional distress against all Defendants. Summary judgment is granted as to MA Fisher, MA Cochrell, and all Defendants who can assert discretionary-act immunity.

To prevail on a claim for IIED under Nevada law, a plaintiff must show: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation." *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000). None of the Defendants is entitled to discretionary-act immunity for this claim, because that defense is not available for intentional torts, which are considered a type of bad-faith conduct that falls outside of any plausible policy objective. *See Franchise Tax Bd. of State of Cal. v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017), *rev'd and remanded on other grounds sub nom. Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019).

54

The Supreme Court of Nevada has defined IIED as "extreme and outrageous conduct" as that which is "outside all possible bounds of decency" and is regarded as "utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998), has referred to the Restatement (Second) of Torts § 46 as relevant authority for IIED claims. *Perez v. Cox*, No. 215CV01572APGDJA, 2022 WL 2704803, at *14 (D. Nev. July 11, 2022) (citing *Olivero*, 995 P.2d at 1026-27 and *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980)). The comments to the Restatement provide that a police officer's conduct may rise to the level of extreme and outrageous when he engages in an "extreme abuse" of his position, such as when the officer attempts to extort money by a threat of arrest, or attempts to extort a confession by falsely telling the accused her child has been injured in an accident and she cannot go to the hospital until she confesses. Restatement (Second) of Torts § 46, cmts. "The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

### 1.    Elko County, County Sheriff, and Employees

Elko County Defendants, Sergeant Silva, and Deputy Defendants argue that they didn't have "any intent" to harm Keaton. (ECF No. 71 at 27). But defendants who are denied summary judgment on deliberate indifference cannot be granted summary judgment on IIED for lacking the requisite degree of intent, because there is a question of fact as to whether they have behaved with a degree of carelessness which is "akin to reckless disregard." *Compare Gordon*, 888 F.3d at 1124-25 *with Olivero*, 995 P.2d at 1025. Neither can they be granted summary judgment for a clear lack of extreme and outrageous conduct. A constitutional violation may amount to "extreme abuse" of an official's position such that a jury may be the one to decide whether the conduct should result in liability. *See*

55

*Chehade Refai*, 614 F. Supp. 2d at 1121. Accordingly, Plaintiffs' IIED claims proceed against Sergeant Silva, Deputy Sneed, Deputy Kendall, and Deputy Holladay.

Plaintiffs have not made their showing that the Sheriff and the Undersheriff "reckless[ly] disgregard[ed]" a risk to Keaton, or that they engaged in "extreme abuse" of their positions. *Olivero*, 995 P.2d at 1025; Restatement (Second) of Torts § 46, cmts. There is nothing to show that they knew about him until after he had already passed away. Although the Sheriff and Undersheriff may have sometimes failed to follow policies that were put in place to ensure the health and well-being of detainees, or failed to ensure that others followed them, Plaintiffs have not brought facts connecting these omissions to Keaton's death.

As for Deputies Hatch and Gonzalez, Plaintiffs have not created a question for trial that their conduct met the applicable standard of carelessness. Plaintiffs' IIED claim against these two Defendants can essentially be summarized as carelessness in failing to seek out additional treatment for Keaton despite knowing that he was mentally ill and dehydrated. While Deputy Hatch knew that Keaton was refusing water, and Deputy Gonzalez knew that he had asked for an IV, it is unclear if they knew or should have known that escalated treatment was needed. It appears that the last time Deputy Hatch saw Keaton was on September 3, and the last time Deputy Gonzalez saw him was on September 1. (ECF No. 83-9.) Both of these defendants are granted summary judgment on deliberate indifference on the basis that the evidence in the record was not sufficient to show that their conduct was "akin to reckless disregard." *Gordon*, 888 F.3d at 1124-25. Plaintiffs have not shown that Deputies Hatch and Gonzalez can be sued in tort for IIED amounting to "reckless disregard" or "extreme abuse" of their official positions. *Olivero*, 995 P.2d at 1025; Restatement (Second) of Torts § 46, cmts.

Plaintiffs' claims of IIED survive against Deputies Sneed, Kendall, and Holladay, Sergeant Silva, and Elko County, and summary judgment is granted as to the Sheriff, Undersheriff, and Deputies Hatch and Gonzalez.

### 2.   Medallus Defendants

All Medallus Defendants, including not only Medical Assistants but also Dr. Vacharothone and Medallus & Vacharothone LTD, argue that their conduct did not rise to the level of outrageousness necessary to constitute IIED under Nevada Law. *Maduike*, 953 P.2d at 26. They argue that the standard for outrageousness is so high that it is not even met where a defendant knowingly refuses to rectify a dangerous condition, *id.*, or where a defendant commits an intentional physical attack. *Star v. Rabello*, 625 P.2d 90 (Nev. 1980).

Medallus Defendants overstate the outrageousness standard. A reasonable jury would likely find the facts of this case more outrageous than the facts of *Maduike,* where a defendant rental car company refused to replace a defective car, but did not compel the plaintiffs to drive the defective car that they had rented. 953 P.2d at 27 (noting that the jury had reduced the plaintiffs' recovery on their remaining claims by forty-five percent due to their comparative negligence). This case also involves a substantially higher degree of harm than *Star*, where the plaintiff and the defendant got into a physical fight at plaintiff's daughter's school after the opening of a school play. 625 P.2d at 91. The plaintiff's allegation of IIED was based not on her own injury, but on her daughter's embarrassment at witnessing the fight. *Id.*

In finding that the element of outrage had not been met, the Supreme Court of Nevada distinguished the facts of *Star* from cases where the defendant outrageously attacked a victim in front of a particularly vulnerable person. *Id.* at 92. The court surveyed three out-of-state, early twentieth-century cases called *Jeppsen, Lambert,* and *Rodgers*, and noted that in all three, an attack could be outrageous enough to give rise to a claim for IIED because the witness was

pregnant or had recently given birth. *Id.* (first citing *Jeppsen v. Jensen*, 155 P. 429 (Utah 1916); then citing *Lambert v. Brewster*, 125 S.E. 244 (W.Va. 1924); and then citing *Rogers v. Williard*, 223 S.W. 15 (Ark. 1920)). A reasonable jury could find that the facts of this case are less like *Star* and more like the instances of outrageous conduct in the cases cited in *Star*. Here, Keaton was especially vulnerable because he was mentally ill, unmedicated, and incarcerated, and dependent on Defendants for his basic survival. *Id.*

Persuasive out-of-state cases where a patient's family member sued a medical professional IIED for inadequate treatment may constitute the most applicable benchmark for "extreme and outrageous conduct" by a medical professional which is "outside all possible bounds of decency" and is regarded as "utterly intolerable in a civilized community." *Maduike*, 953 P.2d at 26; *see Star*, 625 P.2d at 92. A jury could find that this case is like those where a medical professional could be held liable in IIED for a failure to treat that caused a plaintiff unnecessary suffering. *See Star*, 625 P.2d at 91 (citing *Grimsby v. Samson*, 530 P.2d 291 (Wash. 1975)). In *Grimsby*, an out-of-state case cited with approval by the Nevada Supreme Court in *Star*, a husband had a claim for IIED against a doctor when he watched his wife die because the doctor refused to treat her. *Id.* In *Williams,* an IIED claim proceeded against a physician's assistant who provided the plaintiff with inadequate treatment and ignored the plaintiff's requests for additional assistance. *Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 1961143, at *10 (N.D. Ill. Apr. 26, 2018). A jury could find that the Medallus Defendants' behavior was analogous to the Defendants in either of these two cases, since Plaintiffs have brought evidence that tends to show they denied Keaton treatment, particularly psychiatric treatment, that they ignored his requests to go to the hospital, and that they provided inadequate responses to his life-threatening medical needs. For these reasons, MA Powell, MA Chacon, Dr. Vacharothone, and Medallus & Vacharothone LTD's conduct is extreme and

Case 3:23-cv-00390-ART-CSD   Document 99   Filed 03/31/26   Page 59 of 60

outrageous enough to send the question of their liability for IIED to a jury. Although it should have been clear to all of these defendants that Keaton needed a higher level of treatment—all of them having been involved in his care within about two hours of his death—they effectively failed to provide him any meaningful medical assistance.

Plaintiffs have not brought facts showing that MA Fisher and MA Cochrell were in the same position to know of the danger to Keaton and his need for treatment. When they last saw Keaton on August 26 and August 31, he was showing symptoms of mental illness and dehydration. Their failure to take more forceful measures to address those needs does not meet the high standard of outrageousness necessary to support a claim for IIED.

Summary judgment on IIED is granted as to MA Fisher and MA Cochrell, and denied as to MA Powell, MA Chacon, Dr. Vacharothone, and Medallus & Vachorothone LTD.

## VI.    CONCLUSION

It is therefore ordered that Sergeant Michael Silva's motion for summary judgment (ECF No. 68) is GRANTED IN PART and DENIED IN PART. The motion is granted as to Braylen Schomer's claim of loss of familial association against Sergeant Silva. In all other respects, the motion is denied.

It is further ordered that Medallus Medical's motion for summary judgment (ECF No. 70) is GRANTED IN PART and DENIED IN PART. The motion is granted as to all claims against Defendant Geoffrey Fisher, all claims against and Mercedes Cochrell except negligence, and as to Braylen Schomer's claim of loss of familial association against all other movants. In all other respects, the motion is denied.

It is further ordered that Elko County Defendants' motion for summary judgment (ECF No. 71) is GRANTED IN PART and DENIED IN PART. The motion is granted as to all claims against Sheriff Aitor Narvaiza and Undersheriff Justin

Aimes, and as to Braylen Schomer's claim of loss of familial association against Elko County. In all other respects, the motion is DENIED.

It is further ordered that Deputy Defendants' motion for summary judgment (ECF No. 72) is GRANTED IN PART and DENIED IN PART. The motion is granted as to all claims against Deputies Erika Gonzalez and David Hatch, and as to Braylen Schomer's claim of loss of familial association against other movants. In all other respects, the motion is DENIED.

DATED: March 31, 2026

_____

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

60